## NATIONAL LABOR RELATIONS BOARD v. E. C. BROWN CO. et al.

### No. 16, Docket 21615.

United States Court of Appeals
Second Circuit.

Argued Oct. 5, 1950.

Decided Oct. 31, 1950.

---

Gerald Krassa, Washington, D.C., David P. Findling, Associate General Counsel, A. Norman Somers, Assistant General

Counsel, Owsley Vose and William Egan Colby, Attorneys; National Labor Relations Board, all of Washington, D. C., for the Board.

William C. Combs, Rochester, N. Y., Frederick Thompson, Rochester, N. Y., for respondents, Richard B. Secrest, Rochester, N. Y., of counsel.

Before L. HAND, Chief Judge, and SWAN and CLARK, Circuit Judges.

L. HAND, Chief Judge.

This case arises upon a petition by the Labor Board for the usual order "enforcing" its own order in a proceeding before it against two employer corporations upon complaint of a labor union. The questions involved as to the E. C. Brown Company were whether it, the original employer, discriminated against certain employees who were active in organizing a union; whether it refused to deal with the union representative; and whether the succeeding employer, Production Line Manufacturers, Inc., was more than its mask or cloak. The question involved as to the Production Line was whether the union represented a majority of its employees, which in turn depended upon whether it had any existence, independently of the Brown Company. The Board, following its examiner, found that the Brown Company had discriminated against its employees as charged, and had refused to bargain with the union by shutting down its factory in Rochester, and organizing the Production Line as a cover for a revival of its operations. It also found that the Brown Company and the Production Line—its pawn, or tool—had both been guilty of violations of the act in refusing to reemploy the former employees; and it held both companies for back pay. Upon this motion the respondents do not dispute the Board's findings that the Brown Company discharged one employee because he was trying to organize a union, and had refused to promote another for the same reason; that the Production Line refused to reemploy the former Brown employees, when it reopened the factory; and that the

union represented a majority of the employees of the Brown Company when the factory was shut down. They confine themselves to two challenges of the Board's findings: (1) that Brown Company shut down its factory on November 19th, 1947, to circumvent the union; and (2) that the Production Line was a dummy of the Brown Company, not to be treated as an independent corporation. The Board's findings on these issues they maintain are not supported by substantial evidence. The report of the examiner and that of the Board are reported,[1] and in what we say we shall assume an acquaintance with them.

The officers of the Brown Company had certainly not become aware of any agitation to form a union until November 10th, 1947, when handbills were distributed at the factory gates, and by the evening of the next day a majority of the employees had signed union cards. Whether news of these events came to their attention at the time does not certainly appear, but on the 14th the company received a letter from the union, asserting that it represented a majority of the production and maintenance employees, and asking a conference to discuss a contract; and on the 18th the company received a letter from a "field examiner" of the Board setting the 21st as the day for a joint conference as to whether the union should be recognized as the employees' representative. The unlawful discharge was on the 17th and the unlawful denial of promotion was on the 19th, on which day the company shut down the factory. The Production Line was incorporated on December 17th with a capital of 100 shares at a par value of one dollar a share. Within a few days after the formal incorporation these shares had been distributed as follows: 24 shares to each of four persons, the president, Mahrt, the vice-president, E. C. Brown, the secretary, Hunt, and the treasurer, Clinton, and four shares had been distributed to the attorney. Mahrt had been sales manager of the Brown Company and continued as such; E. C. Brown had been plant manager and continued as such; Hunt and Clinton had

1. 81 N.L.R.B., Rep. 140.

been engineers of the Brown Company and continued as such; and the attorney had been attorney for the Brown Company. One, Bullock, the general manager of the Brown Company, and the only one of its officers in charge of production and sale, held 49 per cent of its shares, the remainder being distributed among members of the Brown family, not including, however, E. C. Brown.

On December 31st, 1947, the two corporations executed a contract by which the Production Line took over the production of the Brown Company, which made agricultural "sprayers." In this contract the old company leased the old factory and the old tools to the new company for a term of one year at a rent of $8,000 a month. The new company agreed to buy its own raw materials so far as its credits sufficed; but the old company agreed to use its own credit, if that became necessary. The old company agreed to buy the finished goods of the new company at cost, plus 10 per cent; and the new company agreed not to make any goods which competed with the old company's, and to make all goods which the old company might order. The new company sold $300,000 in "sprayers" during the first three and a half months of its operation, and these the old company sold under its own name. (To outsiders the new company sold less than $300 during the same period.) Since the sales price to the old company was the cost plus 10 per cent, the new company received a profit of a little more than $27,000 which, for three and a half months, was at the rate of just about $8,000—the rent reserved under the lease. Thus the operations of the new company over the only period in evidence resulted in substantially no income, but in a profit of 10 per cent to the old company together with whatever added profit it made upon its sales to customers. If the purpose was that the new company should be no more than the equivalent of a production division of the old, it had been realized with amazing accuracy. The inference that the new company was no more than such a production division is confirmed by the fact that it took over the supervisory and clerical personnel—45 in all—without change,

and continued them at the old salaries. The only change was in the maintenance and production workmen. When the factory reopened late in January, 1948, it was with almost exactly the same number of these—121 as against 124—but of those then taken on only 25 had worked for the old company, and of these 18 had never joined the union. It is true that the other seven had signed union cards, yet it does not appear that the respondents knew that they had; and since only the respondents could have told whether they did or did not know, it is fair to suppose that they did not.

■■■■ In support of the Board's finding we must therefore concede that the old company had shown hostility to the union as soon as it learned of it and that almost at once it shut down the factory. That within a few weeks thereafter it organized the new company to carry on the same business at the same factory, with the same tools, and with the same supervisory and clerical staff at the same salaries. That it insured to itself any profit above cost which the new company could make, and that it stood behind the new company's credit, if that was not good enough to finance its purchases of raw material. That it continued to sell the old goods under its own name, and that the new company, with exceptions too trifling to mention, had no other customer. Finally, that when the new company started up the business again, the only change was that those workmen who were known to have been connected with the union were not reemployed. Surely, the respondents are required to establish with the utmost cogency any other conclusion than the Board's, before we should hold that the findings were without substantial support in the evidence.

The explanation which they do put forward is in two parts: first, they say that the shutdown became necessary because defects in the "sprayers" appeared that had to be remedied; and second, that the losses of the old company during the summer of 1947 had so impaired its credit that it could no longer finance its operations. It is true that during the summer of 1947 "sprayers" had been returned in great

numbers and that the old company had been obliged to "recondition" them at a cost of over $63,000. The difficulty was in the "flux" used in galvanizing the metal to prevent rusting. However, the evidence is clear that this had been corrected by the first of September, when new production was stopped to permit the "reconditioning" to begin; and the respondents do not base the shutdown on this defect, but upon another. They say that, when the "sprayers" came off the line, it was found that water condensed upon the inside surfaces and corroded the metal in spite of the galvanization. The "sprayers" were of two kinds; open ended, and ending in a funnel; and, although it was possible to dry the first by wiping, it was not possible to wipe the second. This defect the old company learned of as early as August first, and its correction was not difficult. All that was necessary was an oven and an "agitator," together with the proper engineering specifications. The old company did not order the oven until November 28th and the blower was not received until December 12th. With these at hand and the specifications prepared, installation was a matter of only a few days, yet the factory was shut down for two months.

At the hearings the respondents gave no satisfactory explanation of this delay; but Bullock, who dominated the old company, in an interview published in a Rochester paper early in December—only a few days after the shutdown—unwittingly disclosed his motives. He then "declared workers had sabotaged many of the company's products and that defective merchandise had been noticed June 17th." "It finally reached the stage where we couldn't separate good employees from the bad. Before any factory employees return to work, if at all, they will be pretty carefully screened. We have no intention of opening the plant now. Our failure to resume work probably will mean liquidation of the company." There is not a syllable in the record to justify this assertion of any sabotage by the employees, and it was made out of whole cloth. The respondents abandoned it at the hearings and substituted the explanation we have

given: i.e., that the defects were due to the "flux," and later to condensation. The Board could scarcely have come to any other conclusion than that the explanation had been contrived after the controversy had arisen.

Nor is the second explanation better: i.e., that the credit of the old company had been so impaired that it could not go on. If the defective "sprayers" sold during the summer of 1947 had injured its name with its customers, the corrective would have been to have the new company sell, which is exactly what it was not allowed to do. If on the other hand the defects in the "sprayers" are supposed to have injured the power of the old company to borrow, we are not told by what reasoning the credit of the new company would be stronger: a company with a capital of $100, managed by officials of the old company, unable to make any profits of its own, and with a credit so feeble as to require the backing of the credit of the old company. Such explanations, instead of being an answer to the inferences, naturally following from the sequence of events we have described, only serve to confirm them.

Let an enforcement order issue.