**MOUNT HOPE FINISHING CO. et al.**

**v.**

**NATIONAL LABOR RELATIONS BOARD.**

**TEXTILE WORKERS UNION OF AMERICA (CIO),**

**v.**

**NATIONAL LABOR RELATIONS BOARD et al.**

**Nos. 6666, 6690.**

United States Court of Appeals Fourth Circuit.

Argued Jan. 5, 1954.

Decided March 15, 1954.

Thornton H. Brooks, Greensboro, N. C. (Gerard D. Reilly, Washington, D. C., Walter G. Powers, Taunton, Mass., C. E. Rhetts and Charles E. Hewes, Washington, D. C., on brief), for the companies and individuals.

Owsley Vose, Attorney, National Labor Relations Board, Washington, D. C. (George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Asst. General Counsel, and Mary E. Williamson, Attorney, National Labor Relations Board, Washington, D. C., on brief), for National Labor Relations Board.

Jacob Minkin, New Bedford, Mass. (Benjamin Wyle, New York City, on brief), for Textile Workers Union of America (CIO).

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

These proceedings bring up for review an order of the N.L.R.B. directed to Mount Hope Finishing Company, a Massachusetts corporation, and to Mt. Hope Finishing Company, Inc., a North Carolina corporation; and to Joseph K. Milliken, Frank L. Daylor and Robert D. Milliken, individuals interested in one or both of the corporations. All of these were respondents to a complaint filed by the Textile Workers Union of America, CIO. The order directed the respondents to cease and desist from discouraging membership in and refusing to bargain with the union, and required the respondents to reinstate certain employees with necessary traveling and moving expenses from Massachusetts to North Carolina, and to make certain employees whole for any loss which they

may have suffered from a discharge or lockout by the Massachusetts corporation on September 19, 1951, and also to make whole 65 employees found by the Board to have been laid off on July 31, 1951, in violation of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. The order was based and the case turns on the finding of the Board that the Massachusetts corporation and the individual respondents closed the plant of that corporation at North Dighton, Massachusetts, and moved the business to Butner, North Carolina, for the purpose of evading their obligation to bargain collectively with the union.

Case No. 6666 embodies the petition of the above named respondents to review and set aside the order of the Board. Case No. 6690 involves the petition of the union to modify the order so as to increase the number of persons found to have been improperly laid off on July 31, 1951 from 65 to 185, and so as to impose the obligation upon the respondents both to offer all employees on the payroll on July 31, 1951 immediate and full reinstatement to their former positions and to make them whole for any loss of pay, and upon request, to bargain collectively with the union as the representative of the employees, without the qualification upon the duty to bargain provided by the Board that the total number of the North Dighton employees who have accepted employment at the Butner plant and the employees at the Butner plant who have joined the union shall constitute a majority of the total employees at that plant.

For fifty years prior to October, 1951, the Massachusetts corporation had its principal office and plant at North Dighton where it was engaged in the dyeing, bleaching and finishing of cotton textiles primarily and synthetic textiles incidentally. It had been established by Joseph K. Milliken and successfully operated by him and his two sons; and the plant was well equipped to carry on the business. In July, 1951 the stock of Joseph K. Milliken, which was held by

the Milliken Foundation Trust, amounted to 46.2% of the total issue, while his sons, Joseph K. Milliken, Jr. and Robert D. Milliken, owned 24.8 and 26% of the issue respectively. The officers were Joseph K. Milliken, President and Treasurer, Joseph K. Milliken, Jr., Vice President and Superintendent, and Robert D. Milliken, Assistant Treasurer. At that time Joseph K. Milliken was 76 years of age, and no longer active, and the family business was under the active management and control of his sons. Joseph K. Milliken, Jr. was in bad health and in August, 1951 retired from the business and shortly thereafter sold his stock to his brother and to Frank L. Daylor, who previously had not been a stockholder but had served the business as industrial consultant and participated in policy decisions. Robert D. Milliken and Daylor also acquired the stock of the Milliken Foundation Trust, so that on or about October 31, 1951 Robert D. Milliken held 60% and Daylor held 36% of the stock which he had purchased for the sum of $400,-000. The officers of the company then were Joseph K. Milliken, President and Treasurer, Frank L. Daylor, Vice President, and Robert D. Milliken, Assistant Treasurer.

In the earlier years and for a substantial period the Massachusetts corporation had prospered. From a modest beginning in 1901 it had developed into an enterprise employing 1300 persons, with a capacity of processing five million yards of goods per week. In 1951, however, prevailing economic conditions, which had caused the heart of the textile industry to seek locations in the South, were unfavorable to the Milliken business in Massachusetts. In January it was operating at less than 50% of capacity; and consequently in April it was decided to reduce the work week to three or four days. Business conditions continued to deteriorate and by July the plant was processing less than 20% of its capacity, and early in the week commencing July 23rd it was decided that 120 employees, who constituted

20% of the working force then employed, should be laid off. On July 30th it was decided to lay off 65 additional employees and on the next day 185 workers were laid off in accordance with these decisions. The labor force which remained was entirely adequate to operate the business.

The unfavorable conditions which reached a climax in 1951 had been the subject of earnest study by the owners of the business for a long time. For more than a year Daylor had been advising them to close the plant and they had been considering the advisability of opening a plant somewhere in the South in order to do the finishing of synthetic material more advantageously closer to the source of supply. During the first five months of 1951 the three Millikens and Daylor each made trips to different locations in the South and examined them as possible sites for a plant. Joseph K. Milliken, Jr. reached the opinion that nothing should be done in this direction; but Robert D. Milliken and Daylor agreed to establish such a plant even if the others would not go along. They tried unsuccessfully in January, 1951 to buy a plant in Greensboro, North Carolina; the site of the Premier Worsted Mill was investigated before March, 1951, and in May the site at Butner, North Carolina, which was finally selected, was strongly recommended to the Millikens by Daylor. On September 23rd Robert D. Milliken expressed his intention to acquire this site and on September 28th secured an option on a lease which was exercised on October 31st.

In the meantime the transactions took place which, as we have seen, led to the acquisition by Robert D. Milliken and Daylor of practically all of the stock of the Massachusetts corporation. In order to conduct the business in North Carolina a new corporation was organized in that State in October, 1951 by attorneys acting for Robert D. Milliken. It was first called the Creedmore Company, but its name was changed in December to Mount Hope Finishing Company, Inc. A nominal issue of only five shares of stock was made, two each in the name of Robert D. Milliken and Daylor, and one in the name of a third person; but the certificates were endorsed and turned back to the attorneys of Robert D. Milliken. It is clear from the record, as the Board found, that Robert D. Milliken became and remains the sole owner of the North Carolina business, and that Daylor has made no investment therein. The following officers of the corporation were elected: Joseph K. Milliken, President, Frank L. Daylor, Vice President, and Robert D. Milliken, Treasurer.

Since January 1952, the Butner plant has been engaged in the finishing of synthetic fibers. It has been operated by the use of machinery and equipment worth $100,000 and supplies worth $750,000 which were sent to North Carolina from the plant of the Massachusetts corporation. These assets are carried on the books of the North Carolina corporation as purchases on open account from the Massachusetts corporation. Similarly the North Carolina corporation had agreed to buy on open account and make use of the trade marks and good will of the Massachusetts corporation. It also employs a subsidiary of the Massachusetts corporation as a sales agent and does finishing work for some of the former customers of the Massachusetts corporation. Certain employees were sent from Massachusetts to North Carolina to set up and install the Butner plant.

On October 20th the Massachusetts plant was shut down after processing of grade goods then in production, and unfinished gray goods were either returned to customers or sent to other finishing plants. Some of the office supplies on hand were sold back to the suppliers at a loss and the remainder was sent to North Carolina. On November 12th the Massachusetts corporation appointed an agent to sell all of the machinery, equipment and inventory, except such as were sent to North Carolina, and by June, 1952 40% of the

assets had been sold and 20% sent to North Carolina. The real estate, except so much as was needed for the storage of the remaining 20% was leased to another corporation. Unquestionably the plant was closed because its continued operation would have entailed a loss. A factor in the situation was a strike of the employees, to which reference will presently be made. Efforts, however, have been made without success to get a sufficient volume of finishing business to enable the plant to reopen.

This recital of the closing of the Massachusetts plant and the sale of a large part of its assets and the establishing of a new business in North Carolina clearly portrays a business change based on sound economic grounds which had affected many other textile concerns. The Labor Board, however, reached a different conclusion. It was impressed by the fact that in the month of July, 1951 the union came upon the scene in the manner now to be described. The Board therefore made the finding that "the motivating factor behind the move was the respondents' desire to evade their obligation to bargain with the union as the bargaining representative of their employees." The validity of the Board's order hangs upon this finding and we shall consider it in the light of the undisputed fact that the union did not come into the picture until after the managers of the Massachusetts business had reached the conclusion that it could not be operated at a profit and had been looking for a suitable location in the South for a subtantial period of time.

The union activities began on July 24th when certain employees of the business in Massachusetts undertook an intensive drive to organize the union. During the next three days 324 of 615 employees then on the payroll applied for membership. Prior thereto, on July 23rd, as we have seen, the company had decided to lay off 120 men effective during the week of July 29th or August 5th. No notice of the proposed reduction was given at the time. On July 28th the company received a letter from the union claiming that it represented a majority of the employees and seeking contract negotiations. On July 30th the company decided to reduce the working force by an additional 65 employees. This action had been previously contemplated by the company, and as the Board found, was inevitable, sooner or later, for economic reasons. Joseph K. Milliken, Jr., Superintendent of the company, testified that the number of employees to be laid off was increased after receiving the union's letter because business was worse than could possibly have been anticipated, and the company could easily get along with a reduction of 30% of the workers on the payroll, and that it would best serve the interests of the company to make the reduction at that time rather than encounter the difficulty of negotiating with the union about it in case the plant should be unionized.

The fact that the reduction of the working force was increased from 20 to 30% was not communicated to the employees and was not known until Joseph K. Milliken, Jr. gave the testimony above referred to at the hearing in June, 1952. There was, in fact, no need for the services of the additional 65 employees. There was no discrimination against union members in selecting the workers to be laid off and there was no attempt on the part of the management to interfere with the formation of the union. The Board, however, found that the layoff of the 65 workers was accelerated in order to avoid bargaining with the union and was therefore an unfair labor practice; and the Board ordered the company to give back pay to the 65 workers for the period beginning with the date of the layoff and ending with the date when they "normally would have been discharged." How the latter date could possibly have been determined the Board does not venture to say and the record does not indicate. If the record shows anything on the point it is that the layoff of the entire 30% was due when it was made because the deteriorating business did not justify their retention.

The company did not immediately accede to the union's request for the recognition which the company received on July 28th. The union on its part did not offer to show to the company that it represented a majority of the employees but on July 30th, before it received the company's answer, filed a petition for certification with the Board. On August 3rd the company by letter refused to recognize the union until it was certified by the Board. The company desired a Board hearing and election because of a dispute between it and the union as to the eligibility to vote of 28 working foremen and because of the company's uncertainty as to the eligibility to vote of the 185 workers who had been laid off on July 31st. The company did not confer with representatives of the union at this time but did confer with the representative of the Board; and thereafter, on August 23rd, the Board held a hearing and on September 6th rendered its decision and directed an election to be held on September 17th which resulted in a majority in favor of the union.

In the meantime, on August 10th, a union meeting was held and the workers, after discussing the company's action in laying off 185 persons and in refusing to bargain with the union, voted to strike on August 13th. Picket lines were set about the plant. Acts of violence were engaged in and by the end of the first week 126 of the 407 workers on the payroll responded to the strike call. The strikers prevented the company from shipping finished goods to its customers and the company applied for and obtained a restraining order from the Board.

On September 18th, the day after the election, the company conferred with the representatives of the union and reached an agreement of settlement which provided for the operation of the mill for four weeks with the employees then working and an attempt to increase the production so as to permit all employees, strikers and non-strikers, to participate, and the closing of the mill in the event that a mutually agreeable solution of these problems was not found. The workers, however, refused to ratify the agreement of settlement.

On September 19th a special meeting of the directors of the company was held and it was voted to cease operations at Dighton, to authorize Frank L. Daylor to negotiate for the sale of the tangible assets of the company, and to authorize Robert D. Milliken to process the goods then in course of production. At this time Robert D. Milliken gave an interview to the press indicating that the plant would close permanently in thirty days and that the management could and would no longer stand the economic and financial pressures incited by the union, and that the company was studying the possibility of setting up a plant in the South.

On October 5th a strike settlement agreement was reached which provided for the cessation of the strike, the completion of the processing of goods actually in production, the stoppage of production on October 20th and, in the event that the company should resume operations, the recall of employees from a seniority list to be made up without discrimination from the seniority list of those on the payroll on July 27th and others added thereafter. The plant was closed on October 20th and has not since been reopened. Efforts were subsequently made to sell the enterprise as a going concern but these were unsuccessful. Additional efforts have been made to dispose of a portion of the plant and retain a limited amount of space and machinery to conduct finishing operations on a small scale, but these have been without avail.

Upon these facts, which are not in dispute, the Board reached the following conclusions:

(1) That the company closed its Massachusetts plant, discharged its employees at that plant, and moved a part of its operations to North Carolina in order to evade its duty under the Act to bargain with the union and thereby interfered with and restrained its employees in the exercise of rights granted

by Section 7 of the Act in violation of Section 8(a)(1) of the Act.

(2) That the shutdown in Massachusetts and the partial removal to North Carolina constituted a discharge and lockout of employees in violation of Section 8(a)(1) and (3) of the Act.

(3) That the company was motivated by economic factors in its layoff of 120 employees but accelerated the layoff of the additional 65 employees so as to avoid bargaining with the union in respect thereto, and that this action constituted discrimination calculated to discourage concerted activities of the employees in violation of Section 8(a)(1) and (3) of the Act.

(4) That the union was the representative of the majority of the employees since July 28, 1951 and that the company has failed and refused to bargain collectively with the union in good faith since that date in violation of Section 8(a)(5) of the Act. In support of this conclusion the Board cites (a) the acceleration of the layoff of 65 employees; (b) the insistence by the company upon formal Board certification as a prerequisite of recognition of the union; (c) the closing of the Massachusetts plant without bargaining with the union in regard thereto and (d) the concealing by the company of its true intentions regarding the Massachusetts plant.

(5) That the North Carolina corporation is the *alter ego* of the Massachusetts corporation and that the individual respondents were parties to the illegal acts and hence all of them are subject to the order of the Board.[1]

 It is manifest that the gravamen of the Board's condemnation, to which all else is incidental, is that the company's reason for closing its Massachusetts plant and opening the North Carolina plant was to avoid negotiations with the union. After an examination of the evidence which we have set out in much detail we cannot conscientiously find reasonable support for the decision of the Board on this point, "when viewed in the light that the record in its entirety furnishes, including the body of the evidence opposed to the Board's view", as required by the statute and the decisions of the Supreme Court. See Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456. The glaring and undeniable fact which dominates all others in the record is that long before the union made its appearance the business was deteriorating and operating at a loss and that the managers of the enterprise were seeking a suitable location in the south. In so doing they were not merely looking for relief from temporary difficulties but from permanent adverse conditions which many other textile businesses had solved by giving up their plants in New England. Exactly that was in the mind of the only member of the Milliken family who was qualified by age and condition of health to carry on the business; and he was supported in his position by the trusted business advisor of the corporation. It is no answer to these undisputed facts to point out that prior to the advent of the union the managers had not definitely decided to cease operations in Massachusetts but were examining the advantages of a smaller experimental plant in the South, and that a final conclusion was not reached until after the union appeared. It was not uncertainty as to the existence of the problem but the gravity of removing a business from a location where it had prospered for half

---

1. To give effect to its order the Board directed the company to offer employment to all the employees at North Dighton who were discharged when the plant closed on October 20th, including the strikers, by reinstating them to their former positions at North Dighton, if it should be reopened, or at the North Carolina plant, reimbursing them in such event for necessary moving expenses, and dismissing, if necessary to provide employment for these workers, all employees at the Butner plant; and also to pay the said employees the amount each would have earned as wages from October 20, 1951 to the date of an offer of reinstatement less earnings during such period.

a century which justified cautious study before decision. The entrance of the union did not alleviate the trouble but served only to accentuate it, and it was obvious to the company that if it could not make a go of the business prior to 1951, before the union was formed, it would be no better able to succeed after the pressure of the union was added to its existing difficulties. It is noteworthy that neither in its opinion nor in its brief does the Board dwell upon the unfavorable economic conditions which for years have confronted the textile industry in New England.[2] The union was not the cause that closed the business in Massachusetts.

In order to reach the conclusion that the business was removed from Massachusetts to North Carolina, it was necessary to hold, and the Board found, that the North Carolina corporation is the *alter ego* of the Massachusetts corporation. In support of this proposition the Board points out amongst other things that Robert D. Milliken owns 60% of the Massachusetts corporation and 100% of the North Carolina corporation; that the two companies have the same officers and the same name and that 80% of the machinery worth $100,000 and supplies worth $750,000 were sent from Massachusetts to North Carolina and are carried on the books of the North Carolina corporation on open account as purchases yet unpaid for. These, of course, are significant circumstances; but the fact remains that the North Carolina business belongs in its entirety to Robert D. Milliken while Daylor owns 36% of the Massachusetts corporation for which he paid $400,000. According to the uncontradicted testimony he has no financial interest in the North Carolina corporation and expects it to fulfill its obligations. Under these circumstances we cannot say that the two corporations are one and the same enterprise. The Massachusetts corporation is now in process of liquidation and so far as can be foreseen, its active life is at an end. The North Carolina corporation is carrying on an active business enterprise. The only reasonable conclusion to be drawn from these facts is that the business of one corporation is at an end and that the business of the new and living corporation is separate and distinct. Aside, however, from this viewpoint it is manifest and we hold that the change from Massachusetts to North Carolina was made for economic reasons and not to avoid bargaining with the union.

The charge that the company locked out and discharged its employees in order to evade its obligation to bargain with the union is merely incidental to the charge that the plant was closed for this purpose and falls for the same reason. The decisions cited by the Board on this point are therefore irrelevant. See N. L. R. B. v. E. C. Brown Co., 2 Cir., 184 F.2d 829; N. L. R. B. v. Wallick, 3 Cir., 198 F.2d 477, 484; Rome Products, 77 N.L.R.B. 1217; Schieber Millinery Co., 26 N.L.R.B. 937, 960–965.

In support of the charge that the company refused to bargain with the union the Board relies upon the decision of the company to increase by 65 the number of employees to be laid off in July as soon as it received the union's letter of July 28th, and also upon the failure of the company to recognize and bargain with the union upon the receipt of its request. The Board points out that 324 out of 615 employees had applied for union membership on or about July 27th and that the company did not make any attempt to ascertain whether or not the union in fact represented a majority. For these reasons the Board finds that the layoff of the 65 workers without previous bargaining with the union not only constituted an attempt to undermine and discourage union membership

---

2. When the company sought to adduce additional evidence concerning the migration of the textile industry from New England to the South, the Board took the position that the petitioners merely sought to produce more detailed evidence on the same issues as to which there was already an abundance of evidence in the record. Board's brief, p. 46; Petitioners' brief, pp. 27–29; Tr. 710, 494.

in violation of Section 8(a)(1) of the Act, but also a refusal to bargain in good faith under the pretense that a certificate by the Board was necessary to establish the union's status.

This line of argument, however, fails to take into account other well established facts. The union did not offer to show to the company by signed membership cards or otherwise that it had the right to speak for the majority of the employees. Instead it filed a representation petition with the Regional Director of the Board on July 30th before it received the company's letter of August 3rd declining to recognize the union until it was certified. The company on its part notified the representative of the Board that it desired the Board to settle two questions concerning which it was in doubt, that is, the eligibility to vote of 28 working foremen and, because of the indefinite duration of the layoff announced on July 31st, the eligibility to vote of 185 employees. On August 23rd, the Board held a meeting at which these were the principal issues considered and on September 6th rendered its decision and directed an election to be held on September 17th.

■■ The case therefore falls within the rule that when an employer is faced with a demand for recognition of a union, he may withhold recognition until the union's claims are established. How this is to be accomplished depends upon the circumstances. As the Board held in Howard W. Davis, d.b.a. The Walmac Co., C.C.H., 2 Labor Law Reports 12,490, No. 12,894, October 29, 1953, the employer normally has the right to insist upon a Board-ordered election but he may not refuse to recognize the union in bad faith in order to gain time in which to undermine the union or dissipate its claimed majority; and other proof, such as signed membership cards, has been deemed sufficient in certain cases especially where it is evident that the employer is determined not to bargain under any conditions or engages in unfair labor practices to get rid of the union. See N. L. R. B. v. Superior Co.,

6 Cir., 199 F.2d 39; North Electric Mfg. Co. v. N. L. R. B., 6 Cir., 123 F.2d 887; Marr Knitting, Inc., 90 N.L.R.B. 479, 481; N. L. R. B. v. Jackson Press, Inc., 7 Cir., 201 F.2d 541; cf. N. L. R. B. v. Clarksburg Publishing Co., 4 Cir., 120 F.2d 976; N. L. R. B. v. Inter City Advertising Co., 4 Cir., 190 F.2d 420, 421; Brown Truck & Trailer Mfg. Co., 32 L.R.R.M. 1580; Southeastern Rubber Co., 32 L.R.R.M. 1590.

■ It is manifest that the refusal of the company to bargain with the union prior to the election was not inspired by the illegal purpose of undermining the union. The company made no effort to interfere with the formation of the union by threat or promises, or in any other of the ways with which the courts have become familiar in cases of this kind. The only basis for the contrary argument is the decision to lay off the additional 65 workers on July 31st; but the Board itself has found that there was no discrimination against union members in the selection of the employees to be laid off, and that the company in fact did not know which employees were members of the union, and had determined to lay off 120 workers for economic reasons before the union drive began. The addition of 65 workers to the list on July 31st, after the union organization was begun, was clearly not intended to hinder the movement because no one outside of the management was told of the increase and the fact was not known until it was disclosed in June, 1952 by Joseph K. Milliken at the Board hearing. Moreover, the total layoff was completely justified by the condition of the business. The strike was clearly an economic and not an unfair practice strike.

■■ In addition it should be noted that issues of eligibility were raised by the company and considered by the Board when the company joined the union in asking for Board action. It is not unlawful for an employer to decline to bargain where an unsolved question concerning representation exists. See

N. L. R. B. v. John Deere Plow Co., 5 Cir., 187 F.2d 26, 82 N.L.R.B. 69; The Solway Process Co., 47 N.L.R.B. 1113, 1122; The M. A. Davidson Co., 94 N.L.R.B. 142, 145. Our conclusion is that the decision on July 31st to increase the number of employees to be laid off did not constitute a discouragement of union membership or an interference with the right of the union to organize in violation of Section 8(a)(3) or 8(a)(1) of the Act; and that the failure of the company to bargain with the union until after it had won the election did not constitute a violation of Section 8(a)(5) of the Act.

Immediately after the result of the election was known, the company, without waiting for certification by the Board, entered into negotiations with the union. Previously in August a series of strike conferences had been held under the auspices of the Massachusetts State Board of Council and Arbitration and on September 18th the abortive strike settlement agreement with the union was reached. On October 5th a strike settlement agreement was signed and on October 20th the plant was closed as contemplated in that agreement. The Board, however, finds that the bargaining was not carried on in good faith because the company had decided to close the plant permanently but led the workers to believe that the shutdown was temporary. The Board found, on disputed testimony, that Robert D. Milliken gave to the press a positive statement on September 19th that the Massachusetts plant would close permanently within 30 days. Hence this possibility was made known to the union; but the company's attorney told the union, despite this statement that he and Daylor would recommend to the directors, if a settlement plan could be worked out, that the plant would operate "in the future". Since this statement was made after the directors had resolved on September 19th to cease operations and had authorized Daylor to get offers for the purchase of the tangible assets, the Board found that the company participated in subsequent negotiations with its tongue in its cheek, and therefore concluded there was no genuine bargaining.

This conclusion must be valued in connection with uncontradicted testimony on the part of the company, belittled by the Board, that subsequent efforts were made to bring about a resumption of operations which would have afforded some employment to the workers. It is, however, not worth while to labor the point. It is only reasonable to conclude that the union was well aware of the difficulties confronting the company and the strong likelihood that it would never be able to resume operations. The final agreement of October 5th, providing for the completion of goods in process, the stoppage of production on October 20th, and the recall of employees without discrimination "in the event" of the resumption of operations does not indicate that the union nor the workers were deceived. Moreover, the union was doubtless aware of the fact, to which the Board does not allude, that the company, having committed no unfair labor practice, had the undoubted right to decide unilaterally and without consultation with the union to close its plant for economic reasons and to endeavor to save some of its investment. See Martel Mills Corp. v. N. L. R. B., 4 Cir., 114 F.2d 624; N. L. R. B. v. Asheville Hosiery Co., 4 Cir., 108 F.2d 288; Union Drawn Steel Co. v. N. L. R. B., 3 Cir., 109 F.2d 587, 592; 152 A.L.R. 149, note; Tarr v. Amalgamated Ass'n of St. Electric Ry. & Motor Coach Employees, Indaho, 73 Idaho 223, 250 P.2d 904.

The Board's order is set aside and enforcement thereof is denied.