FORT SMITH BROADCASTING COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 17669.

United States Court of Appeals
Eighth Circuit.

March 4, 1965.

Allen P. Roberts, of Bethell & Pearce, Fort Smith, Ark., made argument and filed brief, for petitioner.

Peter Giesey, Atty., N. L. R. B., Washington, D. C., made argument for respondent and filed brief with Arnold Ordman, Gen. Counsel, N. L. R. B., Washington, D. C., Dominick L. Manoli, Associate Gen. Counsel, N. L. R. B., Marcel Mallet-Prevost, Asst. Gen. Counsel,

N. L. R. B., and Elliott Moore, Attorney, N. L. R. B., Washington, D. C.

Before VOGEL, VAN OOSTERHOUT and MEHAFFY, Circuit Judges.

MEHAFFY, Circuit Judge.

The Fort Smith Broadcasting Company has petitioned this Court to set aside an order of the National Labor Relations Board which upheld the decision of its Trial Examiner who found that the Company had engaged in conduct violative of §§ 8(a) (1), 8(a) (3) and 8(a) (5) of the National Labor Relations Act, as amended, 29 U.S.C.A. §§ 141–168. The Board, in turn, has petitioned for enforcement of its order. 146 NLRB No. 99.

■ The Company challenges the substantiality of the evidence supporting the Examiner's findings, making it incumbent upon us to review the record as a whole in determining the reasonableness and fairness of the adopting decision by the Board. 29 U.S.C.A. § 160(e); Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); NLRB v. Fruin-Colnon Const. Co., 330 F.2d 885 (8th Cir. 1964); NLRB v. South Rambler Co., 324 F.2d 447 (8th Cir. 1963).

The evidence, largely undisputed, disclosed the following sequence of events. On May 8, 1963, after five employees at the Company's Radio Station KFSA in Fort Smith, Arkansas signed cards authorizing the International Brotherhood of Electrical Workers, AFL–CIO, Local Union 1304 to represent them, Union representative Blair telephoned Station Manager Crews. Blair informed Crews that his union had signed up a majority of five of the station's six control-announcers and one engineer, the only employees which his Union was interested in representing, that he would show proof of their majority representation by a check of the union cards against the payroll, and that on the basis of such a showing, the parties should begin negotiations for a contract. Crews questioned the claimed majority representation, pointing out that one of their engineers who was in the hospital could not have signed a card and that he did not believe announcer Jim Pitcock had signed either. Blair replied that Jim Pitcock had signed, as well as three other announcers and one engineer whom he also named. Crews indicated that he would look into the matter and for Blair to call back later.

Later that afternoon, Blair called John Whitt, a supervisor for the chain of radio and television stations of which KFSA was a part. Blair repeated his claim of majority representation and demanded recognition. Whitt replied that he would give Blair an answer the next day after consulting with Crews.

On the next day, May 9, Whitt, by letter, formally declined recognition of the Union and requested that a Board conducted election be held. After receipt of Whitt's letter of May 9, Blair replied by mail on May 11 enclosing a copy of a petition for a representation election which he had filed with the Board, but still insisting he could provide proof informally of the Union's majority status by a show of cards and requesting that negotiations towards a contract begin thereafter. Subsequently, on May 16, the Company and the Union entered into a stipulation for a consent election in a bargaining unit as originally requested by the Union, but due to the filing of the instant unfair labor practice charges, the representation petition was withdrawn and the election canceled.

Upon learning of the Union's organizational efforts on May 8, Crews immediately called Jim Pitcock, his news director and senior control announcer. Crews and Jim Pitcock were friends of long standing, as Crews had taken a personal interest in Jim Pitcock's education and career. Crews asked Jim Pitcock rhetorically, "I thought you were a loyal employee?" After Jim Pitcock assured Crews that he was, Crews then asked, "Where do you think you will use a union card?", knowing for some time of Jim Pitcock's intention to quit his job with KFSA to accept an announcing position with a Little Rock radio station.

That same afternoon following work, Jim Pitcock decided to visit Crews at his home to discuss the matter of his union activity. When Jim Pitcock arrived, Crews twice refused to discuss union matters with him. Only after Jim Pitcock insisted he did not want anything to interfere with their friendship, did Crews finally invite him into the house. In their ensuing conversation, according to Jim Pitcock, Crews expressed surprise on learning certain other employees had joined the Union. Crews was attributed with saying that had he been at the station that afternoon, "he would have knocked a couple of heads together" and that in the future, "the first time someone goofed up that would be it." Before leaving, Jim Pitcock left the impression that he would not become a member of the Union because he was leaving the employ of the station and wanted to remain friends with crews.

Approximately two weeks later on May 21, Jim Pitcock's younger brother, Jerry, also an announcer at KFSA and one of the five employees who signed union cards, was suspended by Crews after an altercation with fellow employee Bob Curtis. According to Curtis' accredited description of the incident, he was working at the station when Jerry Pitcock, who was off duty, playfully pushed him from behind and proceeded to make a derogatory remark about his clothing in the presence of several other employees. Jerry Pitcock continued to badger Curtis despite the latter's repeated warnings to quit playing and to leave him alone. When those warnings had no effect, Curtis grabbed Jerry Pitcock, slapped him once with his hand and pushed him away, with the admonition that he was not playing but would use his fist the next time.

Curtis reported the incident that afternoon to Crews. Crews obtained verifying accounts of Curtis' version of the altercation from two office girls who were present before mailing Jerry Pitcock a notice on May 22 of his suspension pending a full investigation.

Previous to this latest incident, Jerry Pitcock had been a source of constant difficulty to his employer. In early March, he had caused the station financial loss as a result of an erroneous announcement over the air. Crews had decided then to terminate his employment, but reconsidered only after his brother, Jim Pitcock, pleaded that he be given another chance. Instead of firing Jerry Pitcock, Crews reduced his working hours to part-time, week-end duty.

Crews' more thorough inquiry confirmed the fact that all the witnesses, including Jim Pitcock, agreed that Jerry Pitcock was the protagonist of the incident. In addition, Jerry Pitcock had committed more serious misconduct before and after the suspension. His behavior towards the clerical employees had been impertinent, and on one occasion he had been disrespectful to a client. Despite reprimand, he had slept while on duty causing programming failure over the air; repeatedly permitted unauthorized persons to visit the station against rules; conducted unauthorized contests over the air which were a source of annoyance to the telephone company and the community; and participated with another employee in rifling office files in search of company correspondence concerning the Union election. For these and other reasons, Crews notified Jerry Pitcock on June 4 by letter that his suspension had been converted to permanent discharge.

### § 8(a) (3)

The Board found, in the words of the Examiner, that Crews took "precipitate action" in suspending Jerry Pitcock and not Curtis, in order to exemplify his announced harder attitude towards all the employees in dealing with their shortcomings due to the advent of the Union. The Board concluded that the Company unlawfully discriminated against Jerry Pitcock in violation of § 8(a) (3) because he and other employees had exercised their right to join the Union as guaranteed under § 7 of the Act. However, a majority of the three member panel of the Board approved the Exam-

iner's recommendation not to offer reinstatement or back pay to the discriminatee because his admitted guilt of other serious misconduct which came to the attention of the Company for the first time after his suspension rendered the usual remedy inappropriate.

The Board concedes that if ever an employee deserved summary discharge, Jerry Pitcock was he. However, the Board rejected as incredible the Company's asserted motive of an accumulation of offenses as the reason for suspension of this employee because of the condoning and forgiving attitude displayed by Manager Crews towards Jerry Pitcock's past derelictions.

Positive evidence indicated just the contrary. At the time of his suspension for harassing another employee during work, Jerry Pitcock was in effect on probation, having come within a hairsbreadth of discharge for causing the station financial loss as a result of an erroneous announcement. He had been consistently reprimanded for his other known misconduct and for this error, he was sternly disciplined by demotion to the status of a part-time employee. Furthermore, some of the misconduct prior to the suspension for which Jerry Pitcock was ultimately discharged did not come to the attention of Crews until after the altercation, making prior condonation an impossibility.

In discounting cause as the motive for suspension, the Board attaches much significance to the facts that Crews did not interview Jerry Pitcock, the other participant, nor immediately obtain an account of the incident from his brother, Jim Pitcock, and suspended only Jerry Pitcock during the course of his full investigation.

The facts militate against an inference of discriminatory motive based on these circumstances. After gaining knowledge of the incident, Crews promptly acquired written statements from the two office girls present, mistakenly believing they were the only witnesses. Their statements corroborated Curtis' version. When his subsequent inquiry revealed that Jim Pitcock had been present, Crews obtained his statement which also substantiated the fact that Jerry Pitcock fomented the altercation. And, unlike Jerry Pitcock, Curtis was not a marginal employee on the brink of discharge, which clearly explains his retention in good standing while Crews looked into the matter more fully. Inasmuch as Curtis, not Jerry Pitcock, brought the matter to the attention of Crews after Jim Pitcock had importuned him not to do so, Crews' failure to solicit Jerry Pitcock's side of the story when he failed to volunteer it is understandable.

■■■■ The Board unwarrantedly inferred that Crews' expressed opposition to the Union in a conversation with Jim Pitcock was later manifested by seizing the altercation between Jerry Pitcock and Curtis as an opportunity to demonstrate the Company's new policy of intolerance in dealing with personnel infractions as retaliation for their efforts to organize. We remind the Board that "an employer's general hostility to unions, without more, does not supply an unlawful motive as to a specific discharge." NLRB v. South Rambler Co., supra 324 F.2d at 449–450; Beaver Valley Canning Co. v. NLRB, 332 F.2d 429, 432 (8th Cir. 1964); NLRB v. Redwing Carriers, Inc., 284 F.2d 397, 402 (5th Cir. 1960). Especially, when practically all the remaining evidence establishes an unsatisfactory record of the employee, he is not entitled to special consideration in judging his responsibility for the misdeed which finally strains his employer's leniency to the breaking point. See, NLRB v. Threads, Inc., 308 F.2d 1, 13 (4th Cir. 1962); Wellington Mill Div., West Point Mfg. Co. v. NLRB, 330 F.2d 579, 586 (4th Cir. 1964); NLRB v. United Brass Works, Inc., 287 F.2d 689 (4th Cir. 1961). If discrimination can be inferred from mere union membership and a supervisor's general antagonism for unions, that inference disappears when overwhelming evidence supports the more reasonable conclusion that valid cause motivated the employee's suspension and ultimate termination. See

NLRB v. Stafford, 206 F.2d 19, 23 (8th Cir. 1953).

■ As observed in Steel Industries, Inc. v. NLRB, 325 F.2d 173, 176 (7th Cir. 1963), "an employer has the right to discharge an employee for good reason, bad reason or no reason, absent discrimination." And the Fifth Circuit in NLRB v. McGahey, 233 F.2d 406, 412-13 (5th Cir. 1956) opined:

"The Board's error is the frequent one in which the existence of the reasons stated by the employer as the basis for the discharge is evaluated in terms of its reasonableness. If the discharge was excessively harsh, if lesser forms of discipline would have been adequate, if the discharged employee was more, or just as, capable as the one left to do the job, or the like then, the argument runs, the employer must not actually have been motivated by managerial considerations and (here a full 180 degree swing is made) the stated reason thus dissipated as pretense, nought remains but antiunion purpose as the explanation. But as we have so often said: management is for management. Neither Board nor Court can second-guess it or give it gentle guidance by over-the-shoulder supervision. Management can discharge for good cause, or bad cause, or no cause at all. It has, as the master of its own business affairs, complete freedom with but one specific, definite qualification: it may not discharge when the real motivating purpose is to do that which Section 8(a) (3) forbids."

Jerry Pitcock's persistent misconduct and flagrant violation of the Company's rules foredoomed his discharge. He was not discriminated against because of any union activity. The mere fact that he had signed a union card afforded him no shield for his gross misconduct which more than substantial evidence shows motivated his suspension and discharge by the Company.

## § 8(a) (1)

■ The Board further found that Manager Crews was chargeable with inherently coercive, but undeliberate, statements by questioning his friend's loyalty in joining the Union and intimating to this same employee in a private conversation that in the future "goof ups" by the rank and file would not be tolerated. The Board concluded that a supervisor's threatened withdrawal of personal friendship was coercion tantamount to a threat of job reprisal which resulted in the effective disassociation from the Union by the threatened employee.

■ The fact that Crews denied these statements, or words substantially similar, is a matter of credibility which is not subject to review by this Court. But the substance of the statements themselves and the circumstances under which they were communicated preclude their falling within the § 8(a) (1) ban against an employer's interfering, restraining or coercing an employee in the exercise of his § 7 rights. We believe that an employer's termination of personal friendship with an employee, motivated by antiunion animus, is not within the ambit of illegal conduct which Congress intended to proscribe in § 8 (a) (1). The absence of legislative, administrative or judicial authority to the contrary confirms our belief that such an intangible, non-economic reprisal as the withdrawal of friendship does not tend to inhibit the right of an employee to engage in or refrain from self-organization. The mere display of antiunion or anticompany hostility during the course of an organization campaign is to be expected and not regarded as an unfair labor practice. See NLRB v. Colvert Dairy Products Co., 317 F.2d 44, 46 (10th Cir. 1963).

In support of its position, the Board cites cases involving campaigns of flagrant violations on the part of the company and the union which bear no resemblance and have no application to the situation at bar. Local 901, International Brotherhood of Teamsters,

Chauffeurs, Warehousemen and Helpers of America v. Compton, 291 F.2d 793 (1st Cir. 1961) (strike violence, secondary boycott activity, vile threats); NLRB v. Morris Fishman and Sons, Inc., 278 F.2d 792 (3rd Cir. 1960) (threats of plant closure, picketing, discharge of strikers, surveillance of union activities); Armstrong Cork Co. v. NLRB, 211 F.2d 843 (5th Cir. 1954) (coercive plantwide speech, threats of economic reprisals by supervisors, cancellation of promised wage increase); NLRB v. Nabors, 196 F.2d 272 (5th Cir. 1952) (plantwide speech threatening plant closure, interrogation of employees' union sympathies by supervisors, discriminatory layoffs and discharges).

■ The finding of an unlawful threat by Crews to alter future terms of employment is unsubstantiated in light of the evidence of the context in which the statement was made. Using their friendship as justification, Jim Pitcock voluntarily visited Crews at his home and engaged him in a frank discussion of union activities at the station over the latter's objection. Under these circumstances, Crews' solicited responses, which the evidence fails to show were ever repeated or conveyed to any other employee, were nothing more than candid personal opinions made in an unofficial capacity in an emotionally charged conversation between friends. Nor is the fact that Jim Pitcock valued his friendship with Crews more than his allegiance to the union determinable proof of the remarks' coercive effect. Therefore, the evidence was insufficient upon the record as a whole to find the Company guilty of an unfair labor practice as serious as a violation of § 8(a) (1) because of this lone incident. See NLRB v. Council Mfg. Co., 334 F.2d 161, 165 (8th Cir.

1964); Beaver Valley Canning Co. v. NLRB, supra.

### § 8(a) (5) and § 8(a) (1)

■ And finally the Board adopted its Examiner's finding that the Company violated §§ 8(a) (5) and 8(a) (1), derivatively, by refusing to recognize the Union as the authorized collective bargaining representative of a majority of the employees in an appropriate unit.

■ A bargaining representative which seeks to enforce its right concerning an employer under § 8(a) (5) must show that it has been designated by a majority of the employees, that the unit of representation is appropriate, and that there has been both a demand that the employer bargain and a refusal of recognition by the employer in the absence of any good faith doubt as to the union's majority status.[1] United Mine Workers of America v. Arkansas Oak Flooring Co., 351 U.S. 62, 69, 76 S.Ct. 559, 100 L.Ed. 941 (1956).

At the time of its recognitional demand on May 8, the Union had signed authorization from five employees to act as their collective bargaining representative in an asserted seven member unit composed of three engineers and four control-announcers. The five employees who had signed union cards were engineer Whisenhunt and control-announcers Jerry and Jim Pitcock, Walker and Hyden.

The Company contends that it refused to recognize the Union because it entertained good faith doubt as to the appropriateness of the unit and the Union's majority status. The objection to the unit designation is based on the exclusion of clerical employees in view of the fact that after a hearing on a petition for representation by the Union at another

---

1. "§ 8(a)  It shall be an unfair labor practice for an employer—
    *    *    *    *    *
    "(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a)." 29 U.S.C.A. § 158(a) (5).
    *    *    *    *    *

"§ 9(a)  Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining * * *." 29 U.S.C.A. § 159(a).

station of the Company in Hot Springs, Arkansas, the Board ordered their inclusion with the engineers and announcers in fixing the appropriate unit. The Company also claimed doubt as to the Union's claim of majority representation in the engineer-announcer unit because engineer Whisenhunt, who had been on the staff of the Hot Springs Station, was laid off when that station was shut down and was transferred on a temporary basis to KFSA in Fort Smith; salesman Curtis was a part-time announcer includable within the unit who had not signed a union card; and Jim Pitcock had withdrawn his union membership.

The Trial Examiner's decision which was adopted by the Board concluded that " * * * Respondent, by insisting upon an election to establish its obligation to bargain, was motivated by desire to gain time in which to dissipate the Union's majority status and not any bona fide doubt as to the appropriateness of the unit or the Union's majority status in that unit at the time of its refusal to bargain."

As to the latter basis for the Company's doubt, there is no substantial evidence in the record to support the Board's rejection of its authenticity. The Union did not have a majority of the eligible employees when the employer declined recognition and requested that an election be held. The Union made its claim for recognition known to the Company on May 8. The Company advised that it would give its answer the following day, which it did. Prior to the time of the Company's reply and on the same day of the Union demand, the Company was aware that the Union did not represent a majority of eligible members. Under such circumstances it would have been unlawful for the Company at that time to have entered into an agreement with the Union. See International Ladies' Garment Workers' Union, AFL–CIO v. NLRB, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961).

On May 8, 1963, the date the Union notified the Company that it represented a majority, it took four members of the proposed unit to constitute a majority. Engineer Whisenhunt, who had signed a union card, was not a regular employee of KFSA, and the Board ultimately agreed that he should not have been included within the unit. Thus, a defection by one of the remaining signatories effectively destroyed the Union's majority claim. On the afternoon of May 8, Jim Pitcock, another signer of a union card, went to the home of Manager Crews and disavowed any interest in the Union. He testified:

"(W)hen I left his (Crews') house that afternoon I left him with the impression and I left with the impresssion that I wouldn't be a member of the union.

"Q. Did he ask you to withdraw from the union? A. No."

Jim Pitcock's change of heart was his own decision. It was only at his insistence that Crews conversed with him, and Crews neither requested nor suggested that Jim Pitcock withdraw from the Union. Moreover, there is no record evidence that any Company official even so much as spoke to any other of its employees respecting union activities. Nor is there any evidence that the conversation between Jim Pitcock and Crews was communicated to any other employee. Also evidence is lacking in the record that any antiunion animus played a part in the Company's actions towards its employees before, during or subsequent to its knowledge that the Union was conducting an organizational campaign. Thus, the Board's conclusion that the Company refused to recognize the Union in the absence of an election in order to gain time in which to dissipate the Union's majority status is without substantial evidentiary support.

We find that the evidence on the whole indicates that the employer acted in good faith belief that the Union lacked majority representation when it promptly declined recognition and, therefore, it was warranted in refusing to bargain with the Union until its claim had been resolved by a Board conducted election.

See Edward Fields, Inc. v. NLRB, 325 F.2d 754 (2nd Cir. 1963); Snow v. NLRB, 308 F.2d 687 (9th Cir. 1962); NLRB v. Knickerbocker Plastic Co., 218 F.2d 917, 922 (9th Cir. 1955); Mount Hope Finishing Co. v. NLRB, 211 F.2d 365 (4th Cir. 1954); NLRB v. Poultry Enterprises, Inc., 207 F.2d 522, 524–525 (5th Cir. 1953); NLRB v. Stewart, 207 F.2d 8, 13 (5th Cir. 1953); NLRB v. Epstein, 203 F.2d 482, 484 (3rd Cir. 1953), cert. denied 347 U.S. 912, 74 S.Ct. 474, 98 L.Ed. 1068 (1953); NLRB v. Jackson Press, Inc., 201 F.2d 541, 544 (7th Cir. 1953). Accordingly, the Company was not in violation of §§ 8(a) (5) and 8(a) (1).

The Board's order is set aside and its petition for enforcement denied.