STEEL INDUSTRIES, INCORPO-
RATED, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 13975.

United States Court of Appeals
Seventh Circuit.

Nov. 27, 1963.

As Corrected Nov. 27, 1963.

Charles L. Whistler, Indianapolis, Ind., Joseph B. Carney, Indianapolis, Ind., Baker & Daniels, Indianapolis, Ind., of counsel, for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Jules H. Gordon, Attorney, N. L. R. B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Lee Modjeska, Attorney, N. L. R. B., for respondent.

Before HASTINGS, Chief Judge, and DUFFY and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

This case is here upon petition of Steel Industries, Incorporated (the Company), to review and set aside a portion of an order of the National Labor Relations Board (138 NLRB No. 119), issued against it on September 28, 1962, following the usual proceedings under Section 10 of the National Labor Relations Act, as amended. 61 Stat. 136, 73 Stat. 519, 29 U.S.C.A. § 151 et seq. The complaint was filed on the basis of charges made by International Union, Allied Industrial Workers of America, AFL-CIO (Union). The matter was heard by a Trial Examiner whose findings and conclusions in the main were adopted by the Board. The Board in its answer to the petition requests enforcement of its entire order. This Court has jurisdiction of the proceeding pursuant to Section 10(e) and (f) of the Act, the unfair labor practices having occurred in Crawfordsville, Indiana, where petitioner manufactures products for shipment in interstate commerce.

The Board found that the Company violated Section 8(a) (3) and (1) of the Act by constructively discharging employee Ella White because of her Union activity; 8(a) (2) and (1) by contributing support to and interfering with the administration of a labor organization of its employees, and 8(a) (1) by engaging in unlawful interrogation.

Based on these findings, the Board issued its usual cease and desist order which included a direction to the Company to offer reinstatement to White and to compensate her for any loss of pay, with interest. The Company has complied with the order except the portion as to White, which it here makes the subject of review.

The contested issue as stated in the Board's brief is "Whether substantial evidence supports the Board's finding that the Company constructively discharged employee White in violation of Section (a) (3) and (1) of the Act." We think the Company's statement of contested issues is encompassed in the issue as stated by the Board; however,

it states the issues as "(1) Whether the Board properly concluded that White was discharged and did not voluntarily quit her employment; (2) Whether the Board properly concluded that the Company decided to transfer White for the deliberate purpose of forcing her to quit; (3) Whether the Board properly found that the Company condoned White's quit, and (4) Whether the Board properly ordered the Company to reinstate White."

We think there is no occasion to enter into any detailed discussion of the so-called background history of the Company's relation with the Union. The unfair labor practices found by the Board, which the Company has remedied by compliance, are rather innocuous. Briefly, the Company had permitted participation by one of its foremen in the affairs of a factory committee, had furnished the committee a place to meet and had paid its members for time spent on committee business outside of regular working hours. There was also one instance where a supervisory employee, unauthorized by management, made a derogatory remark about the Union.

Furthermore, the Company concedes that it was opposed to the Union which sought recognition for its employees and that it had knowledge that White was engaged in Union activities for many months prior to an election held May 24, 1961, at which the employees voted 100 to 40 against representation by the Union.

During 1961, the Company's financial and economic situation was such that it sought to increase its efficiency, cut costs and produce a variety of new parts. Effective August 4, 1961, the Company reduced its force by thirteen women who were selected on the basis of an objective rating formula. The General Counsel admitted that the reason for the reduction in force and for the selection of women to be released was economic and non-discriminatory. An unfair practice complaint was filed with respect to an employee (Georgia Wagner), one of the thirteen, who had been active in Union affairs, which was rejected by the Board.

In an effort to improve its efficiency the Company also concluded to replace women operators of its large presses with men. That policy determination was reached in early August 1961, and the Board's decision acknowledges the sound economic basis for it.

White, in August 1961, had been an employee of the Company for almost three years, most of the time as an operator of large presses, although she had also had experience as an operator of small, both of which jobs paid the same. At the time of White's employment she had been assigned to the night shift, as was customary with newly hired employees, which assignment was agreeable to her. Like all employees, however, she was subject to a change of shift at the discretion of the Company. During the period of her employment, she had usually been assigned to the night shift (4:30 p. m. to 12:30 a. m.) and was working on that shift August 11, 1961. She had occasionally, at her own request and for her personal convenience, worked on the day shift—once for two weeks, once for one week and for several days in a number of instances.

Two or three days prior to August 11, 1961, the Company's Production Manager, Philip Feldman, was informed by Grace Wells, a small press operator on the day shift, that she was going to quit. Feldman conveyed this information to Harold Oshry, the Vice President in charge of operations, who instructed him to transfer White to that vacancy. Oshry's explanation for this decision was that the Company had concluded to remove women from the large presses to improve efficiency; a job on the day shift was becoming available for assignment; White had satisfactorily performed the job previously, and the new assignment represented no down-grade in wages.

On Friday, August 11, Feldman instructed the Night Shift Supervisor, Charles Lith, to tell White to come in on the day shift the following Monday, August 14. This message was conveyed by Lith to White at about 10:35 p. m.

White then used a plant telephone to call her husband who told her she would have to quit rather than work days. She punched out her time card, handed it to Lith and said, "Here's my time card, Charlie," and "I quit." She cleaned out her locker, took her personal belongings and left the plant. Her testimony on cross-examination relative to what happened was of such a direct and positive nature that we quote:

"Q. Let me ask this: Did you at some point in that evening hand your card back to Mr. Lith—your time card?

"A. Yes, I did.

"Q. And had you punched it out at that time?

"A. Yes, sir.

"Q. And when you handed it to him didn't you say, 'I quit'?

"A. Yes.

"Q. And didn't you intend to quit?

"A. Yes.

"Q. And you cleaned out your locker, and went and got your personal belongings, and left the plant.

"A. Yes.

"Q. And at that point of the game you had quit in the middle of your shift, before your shift was completed.

"A. Yes, sir.

"Q. And you had quit before saying any word to any person who had authority to approve transfers that you objected to the shift change.

"A. Yes, sir."

The Trial Examiner in his report touches very lightly upon White's testimony as to what took place on the occasion under discussion. He makes no finding that White declared that she "quit" and handed her time card to her supervisor. He gives no recognition to her testimony that she cleaned out her locker and removed her personal effects before leaving or to her testimony that she had deliberately and intentionally quit her employment before leaving the plant. In his report he concedes that the Company's announced policy of changing from large presses to small was dictated by economic need, that White had previously worked satisfactorily on small presses and would suffer no loss in pay by a transfer from the night to the day shift, but reasons:

"We have not even an attempt to explain why the Company, with less upheaval or change, would not retain on the day shift one of the three (there was reference to a fourth) women whom it was now transferring to the night shift, thus making one change fewer to the night shift, and also making unnecessary any shift transfer for White even if her work assignment were justifiably changed."

The Examiner overlooks the fact that the women to whom he refers had been transferred, as we understand, from the day to the night shift a week before White quit. In this connection, the Examiner emphasizes the circumstances concerning employee Brady who, upon her return from an absence because of sickness, was told that she was being transferred from the day to the night shift. She had been working on the former and desired to remain there because she was required to be home at night. The Examiner reasons that the Company could have satisfied both White and Brady by permitting each of them to remain on the shift which she desired and where she had previously worked.

The rule has often been announced that an employer has the right to discharge an employee for good reason, bad reason or no reason, absent discrimination. We think the employer has the same right in assigning its employees. Moreover, the contention that the Company might have recalled from the night shift one of the three employees previously transferred there in order to make a place on that shift for White, or that it might have permitted White to remain on the night shift rather

than transfer Brady to that shift, is beside the point. It might be, if the Trial Examiner had occupied the shoes of management, that he would have done so in order to accommodate both White and Brady. Even so, no inference unfavorable to the Company can be deduced from these circumstances. The shift assignments were matters peculiarly within the prerogative of management, and its reasonable business decision is of no legitimate concern either of the Board or the Courts.

■ This Court, in Portable Electric Tools, Inc. v. N. L. R. B., 7 Cir., 309 F.2d 423, 426, quoted from N. L. R. B. v. McGahey, 5 Cir., 233 F.2d 406, 412, a statement pertinent to the instant situation which we think worth repeating:

"The Board's error is the frequent one in which the existence of the reasons stated by the employer as the basis for the discharge is evaluated in terms of its reasonableness. If the discharge was excessively harsh, if lesser forms of discipline would have been adequate, if the discharged employee was more, or just as, capable as the one left to do the job, or the like then, the argument runs, the employer must not actually have been motivated by managerial considerations, and (here a full 180 degree swing is made) the stated reason thus dissipated as pretense, nought remains but antiunion purpose as the explanation. But as we have so often said: management is for management. Neither Board nor Court can second-guess it or give it gentle guidance by over-the-shoulder supervision. Management can discharge for good cause, or bad cause, or no cause at all. It has, as the master of its own business affairs, complete freedom with but one specific, definite qualification: it may not discharge when the real motivating purpose is to do that which Section 8(a) (3) forbids."

■ In our judgment, the finding of the Trial Examiner, approved by the Board, that White on August 11, 1961 was constructively or discriminatorily discharged from her job, is not substantially supported by the record. The finding should have been that she voluntarily, intentionally and unequivocally quit her employment in the midst of her working shift on August 11, 1961, after being informed that she was to be transferred to a job on the day shift effective August 14, 1961, and that her quitting was not the result of force or discrimination on the part of the Company. The positive, unequivocal, direct testimony of White herself impels the validity of such a finding. She made the decision to quit after communicating by telephone with her husband. Thus, in effect, a joint decision was made that she must quit rather than accept an assignment on the day shift. Her statement, and perhaps more important, her conduct at the time leaves not the slightest basis for a contrary view. More than that, she testified before the Examiner that she intended to do that very thing.

■ The Board admonishes us that whether certain conduct constitutes the "quitting" of a job is a question of fact to be determined by it, but there should be added, provided its determination is supported by substantial evidence. Numerous cases are cited by the respective parties in which the Courts have dealt with the problem. These are not too helpful because the factual situation varies from case to case. Perhaps the most pertinent is the very recent case of Dunn Brothers, Inc. v. N. L. R. B., 6 Cir., 321 F.2d 185, where two employees walked off their jobs and later engaged in picketing the employer. An essential issue was whether they walked off the jobs for that purpose or for a nonprotected activity. The Court, in discussing the finding of the Examiner contrary to the testimony given by the employees, stated (page 188):

" * * * they say they did not leave the store on September 16 to engage

in a strike and picketing. The Trial Examiner found that they did; they deny it. In spite of speculation—and intellectual speculation—as to why they did leave the store, their own testimony is the strongest evidence on this point; and the Trial Examiner's finding, based on his analysis of circumstances, that they left the store to engage in a strike and picketing, is not supported by substantial evidence."

The Board's petition for enforcement of its order, based on the finding of the Trial Examiner, was denied.

In N. L. R. B. v. Winona Knitting Mills, Inc., 8 Cir., 163 F.2d 156, the Court considered a factual situation similar to that here. In that case, the Court held that the finding that the employee had been constructively discharged because of her Union activity was without substantial support, and enforcement of the Board's order was denied. There, the employer had an anti-Union record and the employee was an active member of the Union. She had originally been on the day shift but at her request had been transferred to night work because of her inability to find anyone to care for her baby during the day. She was ordered transferred back to the day shift because of strained relations, so the Company claimed, between her and the night foreman. She refused to accept the day shift assignment, requested her release and left.

In N. L. R. B. v. Port Gibson Veneer & Box Co., 5 Cir., 167 F.2d 144, the Court refused enforcement of the Board's order directing that three employees be reinstated. The Court stated (page 146):

"Having walked off their jobs prematurely and voluntarily, they thereby lost their status of employees and are consequently not entitled to reinstatement."

The Board cites N. L. R. B. v. Berg-Airlectro Products Co., 7 Cir., 302 F.2d 474, wherein this Court sustained a finding of the Board that an employee had been constructively discharged. The Company contended that the employee voluntarily quit. Concerning the proof on this issue, this Court stated (page 476):

"July 2, when she came to the plant and found her time card missing, Odessa Stewart asked superintendent Porter if she was fired. He answered, 'No Odessa, you quit.' She said, 'Did I tell you I had quit?' He said, 'No, you didn't tell me * *.' She said, 'I didn't quit; I went to the Labor Board.' He answered, 'You still quit.' Porter later told the President of the Local that she had quit."

These facts are in marked contrast to those here, where the employee testified that she quit and that is what she intended to do.

In N. L. R. B. v. Stowe Spinning Co. et al., 4 Cir., 165 F.2d 609, the Court approved a finding that the employee was discharged for Union activities and did not voluntarily resign, as claimed by the employer. Again, the evidence was far afield from that here. In that case, the employee had been reprimanded by his superior and, as the Court stated (page 615):

"Hall then lost his temper and said that before he would do the work he would quit. McCarn replied 'all right' whereupon Hall said he would not quit and that McCarn would have to fire him."

The employee's application for reinstatement was denied by the employer on the basis that he had voluntarily quit his employment. This contention was denied by the Board and sustained by the Court.

Other cases cited by the Board do no more than reiterate the rule that a Court is obligated to accept the findings of the Board if substantially supported.

It appears to have been the position of the Examiner, sustained by the Board, that it could be properly inferred that White was constructively and discrimi-

natorily discharged on evidence that the Company was anti-Union, that she was an active Union member and that the Company knew that she would not accept an assignment on the day shift because of illness in her family—in other words, that the Company concocted a scheme to rid itself of White as an employee. The argument is specious and any weight to which it might be entitled is completely dissipated by the undisputed fact that White quit voluntarily without even giving a reason or excuse. More than that, the Examiner made the anemic finding that the Company was "aware of the possibility that she would refuse to work on the day shift." Almost anything is possible and we think the same finding could be made with reference to any employee when ordered to change shifts. The record furnishes no basis even for a healthy suspicion, much less a finding, that the Company schemed to get rid of White as an employee. The severance of her relationship with the Company was the result of her own doing and not that of the Company.

The Board attempts in feeble fashion to fortify the validity of its order as it pertains to White by contending that the Company subsequently condoned her conduct and gave recognition to the fact that the employment relationship was still in existence. The Board cites no case in support of this contention. This doctrine of condonation, or sometimes referred to as forgiveness on the part of an employer, was considered in N. L. R. B. v. Marshall Car Wheel and Foundry Co., 5 Cir., 218 F.2d 409, 414, wherein the Court stated:

"Where, as here, the strike misconduct is clearly shown, condonation may not be lightly presumed from mere silence or equivocal statements, but must clearly appear from some positive act by an employer indicating forgiveness and an intention of treating the guilty employees as if their misconduct had not occurred."

In Plasti-Line, Inc. v. N. L. R. B., 6 Cir. 278 F.2d 482, 487, the Court stated:

"There is no evidence whatever of a positive act by the petitioners to indicate either a forgiveness of the strikers or an intention to resume their former relationship with them."

At about 11 p. m., shortly after her departure from the plant, White telephoned Feldman, the Company's Production Manager, and a few minutes later, Phelps, the Manager of Personnel. In brief, her testimony discloses that Feldman confirmed, in response to White's inquiry, that he had left instructions for her to be notified of the transfer and that he expected her in on the new assignment. In the conversation she told Feldman that she had always worked nights and inquired if she would be fired if she did not report on the day shift on Monday. Feldman replied that it was necessary and that he wanted her to come in on days beginning Monday. White responded, "I quit," and hung up. It is not disputed that Feldman at the time of the conversation was not aware that White a short time before had announced that she quit, gathered her belongings and walked off her shift. Feldman could not have condoned or forgiven an act of which he was not aware.

White, after her telephone conversation with Feldman, called Phelps and, according to her testimony, told him it was impossible for her to work days because of illness in her family. She inquired of him if she could replace or trade places with one of the three large press operators who had been transferred from day to night shift. She also told Phelps that she had turned in her card and "quit" and asked if she would be fired if she did not report for work on the day shift Monday. Phelps told her that the transfer was necessary because of job changes and that she had better come in Monday on the day shift. Phelps in his testimony denied that he told White she had better come in Monday on the day shift. He testified, "I told her to come in and

we would talk about it. I wanted to hear both sides of the question, if there was any question, and we would take it up through channels and get her an answer." The Board in its brief states that the Trial Examiner credited White's version of the conversation and discredited that of Phelps. This is an overstatement of the record. The Examiner sets forth the testimony of both White and Phelps but makes no finding in this respect, as asserted by the Board. The most that can be said is that in the argumentative portion of his report, he appears to have relied on the testimony of White. No reasonable basis is discernible as to why the testimony of Phelps should be rejected and White's accepted, particularly in view of the fact that the Examiner discredited her testimony on numerous other issues in the case.

The Board on brief states, "Certainly White would not have been concerned about being 'fired' if she did not consider that she was still an employee." This argument is beside the point because insofar as White was concerned the die had already been cast by her voluntary act in severing the employment relationship. More than that, she did not return to the plant on Monday or any other time and after the telephone conversations had no further communication with any person representing the Company. This was a clear recognition on her part that she was no longer an employee. She could hardly have thought otherwise because in addition to walking off her job in the middle of her shift she told both Feldman and Phelps in the telephone conversations, "I quit."

In our judgment, the theory of condonation or forgiveness on the part of the Company is without merit. White at the plant made her decision to quit, which was reiterated in her telephone conversations with Feldman and Phelps. It is conclusively shown by her words and her conduct that she had deliberately decided to work a shift of her own choosing or not work.

There is no basis for a finding or conclusion that White was constructively discharged by the Company because of her Union activity or for any other reason. Particularly is this so in view of the positive, direct testimony of White to the contrary.

The Company's petition to review and set aside. the portion of the Labor Board's order as it relates to Ella Jane White is allowed and the Board's request for enforcement of its order in that respect is denied.