**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**CENTURY BROADCASTING CORPO-
RATION, Respondent.**

No. 19547.

United States Court of Appeals
Eighth Circuit.

Dec. 9, 1969.

Rehearing Denied Jan. 30, 1970.

Lay, Circuit Judge, dissented.

Baruch A. Fellner, Atty., N.L.R.B., Washington, D. C., for petitioner; Arnold Ordman, Gen. Counsel, N.L.R.B., Dominick L. Manoli, Associate Gen. Counsel, N.L.R.B., Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., and Bernard Cushman, Atty., N.L.R.B., Washington, D. C., with him on the brief.

George A. Collias, Chicago, Ill., Gen. Counsel for Century Broadcasting Corp., for respondent.

Before BLACKMUN, MEHAFFY and LAY, Circuit Judges.

MEHAFFY, Circuit Judge.

This case comes to us on a petition of the National Labor Relations Board to enforce its order against the Century Broadcasting Corporation, the Board having found that the Company violated § 8(a) (1) of the National Labor Relations Act by interrogating and threatening one employee with respect to union activities and also that the Company violated § 8(a) (1) and (3) of the Act by discharging three employees because of their union activities and a fourth (the one allegedly interrogated and threatened) because of his union activities, coupled with his pressing of a claim for pay under the collective bargaining agreement. The Board's order, issued May 20, 1968, is reported in 171 NLRB No. 78. Jurisdiction is established under § 10(e) of the Act, 29 U.S.C. § 160 (e).

The Board and the Company agree on the facts, but the Company asserts that the evidence considered as a whole does not support the Board's findings that a prima facie case was presented by sustaining its burden of proof. No witnesses testified in behalf of the Company. Since both parties also cite in several instances the same authorities for their respective positions, there does not seem to be too much disagreement as to the law, but rather a disagreement as to its interpretation and application to the facts, and, in sum, our disposition requires a canvass of the evidence as a whole as required by Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

Century Broadcasting Company operates radio station KSHE in Crestwood (St. Louis), Missouri, and employs approximately fourteen people. The complaint filed by the International Brotherhood of Electrical Workers, AFL–CIO, Local 4, as amended, alleged that the Company had violated § 8(a) (3) of the National Labor Relations Act, as amended, 73 Stat. 519, by discharging Peter M. Flannery, Nicholas K. Barr and Robert J. Vierling, announcers, on August 8, 9 and 10, 1967, respectively, and Robert G. Taylor, a technician, on August 24, 1967, because of union membership or other concerted activities. The complaint further alleged that the Company had violated § 8(a) (1) of the Act by interrogating and threatening Taylor with respect to union activities. The Trial Examiner found the Company guilty of the violations charged and the Board affirmed his decision and entered his recommended order, the enforcement of which is here sought.

The principal issues are (1) whether the Board was correct in affirming the Trial Examiner's finding that the Company had knowledge of the announcers' union activities and discharged them because of such activities, when the Trial Examiner based his inference of knowledge on the mere fact that the Company did not put on any witnesses to deny these charges, or whether other evidence in the record would compel such a finding; (2) whether there was sufficient evidence to support the Board's finding that the technician, Taylor, was discriminatorily discharged because of

his union membership, union activity, and the pressing of a claim for the payment of the union wage scale; and (3) whether the conversations which the general manager of KSHE, Sheldon, had with Taylor included interrogation and threats prohibited under the Act.

The Company and the Union entered into a collective bargaining agreement covering KSHE's technicians and engineers on June 1, 1966, and this agreement covered only one of the discharged employees, Taylor. The idea of the announcers' joining a union was first mentioned by Barr to Flannery the latter part of May, 1967, but no particular union was mentioned at that time. Then Barr talked with Taylor who said that I.B.E.W. had a category for "announcer-operators" and said he thought joining the union would help the announcers with regard to wages, fringe benefits and job security.

In June, 1967, the station was moved to the Crestwood location. This resulted in considerable technical difficulties because of the close proximity of the transmitter, it being in the same building. Thereafter, tapes could not be played but, instead, records had to be used, which resulted in more work for the announcers. At that time Edward Ceries was general manager of the station and also broadcast engineer and Taylor worked with him as another broadcast engineer. Barr, who was the staff announcer with the longest tenure, was also news director. On or about July 17, 1967, while Ceries and Barr were on vacation, the president of the Company, Howard Grafman, relieved Ceries of his duties and made Harvey Sheldon the general manager. Sheldon had been employed by the Company a short time before to do a controversial talk show. Taylor was named at the same time as chief engineer of KSHE and Barr was made program director. When Barr returned from vacation, he found a directive on the wall signed by Sheldon instructing him on the format he was to follow as program director. He was advised by Sheldon that he would work four hours a day as announcer-operator and four hours as program director.

Thereafter, the discussions concerning joining the union became more frequent and more serious, Barr and Flannery consulting the other announcers as to their feelings. Vierling testified that Barr first mentioned it to him the latter part of July, and Barr, Flannery and Vierling all thought it would be a good idea. These announcers testified, however, that the other full-time announcer, Robert Mundy, stated that he thought it would be bad for the Company, that the president, Mr. Grafman, wouldn't like it, and that it would be a threat to his own job. He said that he was a personal friend of Mr. Grafman, that he had a more or less permanent contract with him, that joining the union wouldn't benefit him, and that he didn't think it would be the right thing to do to sign a union card without first talking to Mr. Grafman. Vierling testified that Mundy told him he would "like to" or "have to" talk with Grafman before he would sign a card, but there was no testimony that he said he was actually going to talk with Grafman. Mundy was not called to testify and it is not contended that he did talk with Grafman. Flannery testified that Mundy told him that he wasn't against the union but wasn't going to push for it. Valetta Wood and Diane Bauman, who did secretarial and clerical work for the Company, were also told that the announcers were considering joining the union. They replied that they thought it would be a good idea and promised not to tell Sheldon. Diane Bauman left the employ of KSHE the latter part of July.

On or about July 20, 1967, Merril V. Davis, the union's business manager, was interviewed on Sheldon's radio show and remarked during the course of their conversation in Sheldon's office that the union was going to organize the announcer-operators. Davis testified that Sheldon laughed and said, "Oh, no, not that." This was the extent of their conversation on the subject.

On August 7, 1967, Barr called Davis from Taylor's home and told him the announcers would like to join the union, and Davis said to pick up the authorization cards from him, sign them, and return them. Barr and Taylor picked them up that afternoon and that evening Barr and Vierling signed the cards at Barr's home, dating them the following day, August 8. Barr took a card to the control room where Flannery was working on the 8th and Flannery signed it. No one else was present. It is not contended that Sheldon saw him sign the card, although he was in the production studio at the time. Barr testified that the control room was designed to keep out noises and that you would probably have to have your ear up to the glass to hear outside conversations. That night about 8:45 Sheldon came into the room where Flannery was working and gave him a week's notice. Sheldon told him, however, that he didn't want him to think that his discharge reflected in any way upon his performance at the station.

The cards had not been turned over to the union at that time but were given to Taylor late that evening and he delivered them to the office of I.B.E.W. the next morning. Sheldon was not notified of this by Davis, however, until August 10.[1]

About 9:30 a. m. on the 9th, Sheldon told Barr that he felt his services were no longer needed at the station—that he was to work until Friday and then he was through. Sheldon gave as his reason that there was too much dissension in the ranks, that everybody disagreed with him. Barr asked him if he was doing his job poorly or if he had made some error or had fallen short and Sheldon said no. Two days before then Barr had resigned his job as program director, advising Sheldon that he felt he couldn't carry on the functions of both announcer and program director and Sheldon had said that it was fine with him. Sheldon told him at that time that effective Monday, August 14, the working hours would be changed to six hours a day, six days a week, and gave no indication that he intended to terminate Barr. When Barr asked for a service letter, or letter of recommendation, on the 11th, Sheldon first promised it but later

1. The Trial Examiner erred in stating:
"We recall that on or about August 9 Davis told Sheldon that he had a majority and would like to discuss a contract, and that Sheldon cited the two discharges already effected."
A thorough canvass of the record fails to disclose any testimony that the telephone call was made on August 9. Although Davis testified on one occasion that it was "on or about August 10" he testified several times that he believed it was on the 10th, and Taylor testified positively that it was on August 10. In response to a question as to whether the conversation could have been on the 11th, a Friday, Davis again testified that he believed it was on the 10th, but that he didn't remember the day of the week—whether it was on a Thursday or Friday (August 10 or 11). Taylor testified on direct examination that he was called into Sheldon's office and was told of the conversation by Sheldon immediately after Davis called, which was about midmorning on August 10. On cross-examination, Taylor further testified:

"Q. (By Mr. Tockman) Let me withdraw the last question and ask you in relation to the conversation that you have testified about as definitely occurring with Mr. Sheldon on August 10, was it [the date on which Nick Barr was advised by Harvey Sheldon that he was going to be leaving the employ of the company] prior to that time?
"A. It was before I spoke to Mr. Sheldon.
"Q. And with respect to Mr. Flannery, do you know whether the date on which he was advised that he would be leaving the employment of the company by Mr. Sheldon was before August 10, the meeting that you had with Mr. Sheldon?
"A. Yes, that was also before that."
Also, the General Counsel accepts August 10 as the date on which Davis telephoned Sheldon that some of the announcers had signed authorization cards, stating in his brief the following:
"On the morning of August 10, Union Representative Davis informed Sheldon that a majority of the announcers had signed authorization cards and that he would like to discuss a contract."

told Barr he would have to talk with Grafman. Grafman said he would have to wait until the N.L.R.B. hearings were over—that Barr had filed charges and that stopped the letter.

As hereinbefore mentioned, Davis telephoned Sheldon on August 10 and said that he thought he had cards from a majority of the announcers and that he would like to discuss a contract. Sheldon replied that he had already discharged two of the men, referring to the announcers (Flannery on the 8th and Barr on the 9th), but he nevertheless made an appointment to discuss the matter. Davis, however, did not keep the appointment. Sheldon called Taylor into his office about mid-morning on the 10th and told him that he had just received a call from Davis requesting that the station recognize these announcers as members of Local 4, and he asked Taylor, "Did you know they were going union?" Taylor testified that he acted as though he "didn't have sides in this" and told Sheldon that he wasn't telling the men what the station was doing or the station what the men were doing—that he was just going to stay in the middle of the road.

About 2:15 that afternoon, August 10, Sheldon came into the control room and told Vierling that he was giving him notice that his last day would be Friday, August 12. He said that it was no reflection on Vierling's ability or performance but that he was making a change in the entire staff because of disunity between the management and staff. Vierling was first promised a letter of recommendation by Sheldon but was told after Sheldon talked with Grafman that he couldn't give it to him then. The three announcers then filed unfair labor practice charges against the Company.

On August 20, 1967, while Sheldon and Taylor were having lunch together, Sheldon asked him what he thought of the changes in personnel, to which Taylor replied that he didn't have a specific opinion but didn't really understand the dismissal of Flannery, Barr and Vier-

ling. Sheldon answered, "Well, you know, I did it." Taylor told him that he knew he did it but he thought they were represented by a union, to which Sheldon replied, "Well, no, no, that didn't enter into it. I just fired them." Then he added, "They really shouldn't go to a union. There are two things in this world you never do, one of them is to go to a union to ask for representation and the other one is file suit against someone." Then Taylor said that the men had asked for representation before Sheldon fired them and Sheldon replied that that made no difference.

In the meantime, Taylor was also having his own problems. He was originally hired as a background music installer at a salary of $144.00 a week, and was represented by I.B.E.W., Local 1. On June 1st or 2nd, he was named broadcast engineer, which was under the jurisdiction of Local 4, which had a contract with KSHE, and Taylor was required to become a member of that Local. He then received a salary of $175.00 a week. On or about July 17, he was named as chief engineer, which was also under the jurisdiction of Local 4. Under the Company's contract with Local 4, the base weekly rate of pay for a chief engineer was $190.00 per week and Taylor called this to Sheldon's attention. Thereupon, Sheldon told Taylor to drop a note to the home office in Chicago and inform the Company of that fact. Taylor did not do so, however, thinking it would be better to wait and send the note with the payroll. Before this was done, Sheldon told Taylor that he and Grafman had decided that Milan Leggett of Dallas was the chief engineer referred to in the wage scale and that Taylor, as chief engineer of KSHE only, was not entitled to $190.00 per week. Taylor then called Leggett who said he considered himself to be the supervisor of all the engineers, and Taylor asked him to call Grafman and help him get the matter straightened out.

On August 22, Taylor told Sheldon that if he weren't really chief engineer he was going to have to revert back

to the duties of a broadcast engineer and not be subject to 24-hour call but have regular working hours. He also told Sheldon that under the contract, if he were called down to the station when he was not supposed to be on duty he would be entitled to pay for a minimum of four hours at the overtime rate. Sheldon reluctantly agreed to this and posted the hours Taylor was to work.

About 6:30 that evening Taylor received a call to come to the station and fix some equipment, and he checked with Sheldon who authorized the overtime rate. When he arrived, the trouble had been found and corrected but he went in and checked the equipment to see that everything was all right. The next morning Sheldon objected to his claiming pay for four hours at the overtime rate since he hadn't been required to do any work when he got there. Sheldon said he wasn't going to give him the time until he put in four full hours, and that he had told one of the announcers to tell him to stay there. Taylor denied that he was told to stay, said that he was dressed to go to a wedding when he was called, that he had to change his clothes and go down, and that he was entitled to a minimum of four hours' overtime pay whether he had to do anything when he got there or whether he stayed the full four hours or not. Sheldon said he would have to look into the matter, and Taylor replied that he would contact his union and tell it that he had claimed these hours and had been refused. He again called Leggett in Dallas who promised to talk with Grafman.

On August 24, 1967, Grafman called Taylor into his office. Sheldon was present and Grafman told Taylor that he and Sheldon had decided that Taylor would be best suited for the background music department. Taylor asked if he were being dismissed as broadcast engineer and they told him no, that they just wanted him as a background music man. He replied that he wasn't at liberty to accept the position since it was controlled under Local 1 and he was a member of Local 4. Taylor then asked

for a letter of dismissal and was refused, but was told that he could consider himself dismissed immediately. He was later asked to come back for a remote broadcast from 7:00 to 11:00 that night, which he agreed to do. He told Grafman and Sheldon that he would have to have three days to decide whether he would accept the position in the background music department. He did not accept the position but, instead, joined with the three announcers in filing unfair labor practice charges against the Company with the National Labor Relations Board. Thereafter, the complaint filed by the Board was amended to include Taylor as one of the employees allegedly discriminatorily discharged by the Company.

The Trial Examiner found that it was unnecessary to consider the small plant rule that everyone in a small plant is presumed to know of any union organizational activities if they are going on, stating that there was other evidence which warranted a reliable inference. He discounted the likelihood that the management would have learned of union activities through Wood and Bauman and said that the greater likelihood of company knowledge to explain the discharge of the employees lay in the conversations with Mundy, but concluded:

> Whether Mundy did talk about this with Grafman we do not know * * *. The inference of Company knowledge of the union activity and support of its employees is here more readily drawn in the absence of disclaimer (except by counsel) of knowledge by the Company and of any denial by Mundy that he had transmitted he information."

We think the Trial Examiner and the Board, in affirming his decision, placed undue emphasis on the Company's failure to produce witnesses to deny knowledge of the employees' union activities. It was up to the General Counsel for the Board to prove that the Company had knowledge of the activities and where the Board has not succeeded in proving this, knowledge cannot be

inferred simply because the Company did not put on any witnesses to deny it.

We have concluded that since the record does not show that the Company had knowledge that Flannery and Barr were engaged in any union organizational activity or had signed authorization cards at the time they were discharged, and the Trial Examiner did not find evidence to this effect, he was not justified in drawing the inference that the Company had knowledge and that this motivated the discharges, merely because the Company chose not to offer any proof at the trial.

In Schwob Mfg. Co. v. N.L.R.B., 297 F.2d 864, 868 (5th Cir. 1962), wherein the court held that the evidence did not support a finding by the Board that the discharge of an employee was for union activity or membership, the court had this to say with regard to the failure of a respondent to put on proof:

"In cases of this nature the burden of proof is upon the General Counsel. As stated in N.L.R.B. v. Wintergarden Citrus Production Co-op., 260 F.2d 913:

"'It is not and never has been the law that the board may recover upon failure of the respondent to make proof. The burden is on the board throughout to prove its allegations, and this burden never shifts. It is, of course, true that if the board offers sufficient evidence to support a finding against it, a respondent, as stated in the quotation first above, stands in danger of having such a finding made unless he refutes the evidence which supports it. But it is wholly incorrect to say or suggest that the burden of showing compliance with the act ever shifts to the respondent. The burden of showing no compliance is always on the board. Even in cases of actual discharges, cases in short in which the respondent has taken affirmative action against an employee, this is true, as this court has many times held.'"

In this case, organizational activities were conducted in secret. The announcers secured promises from the secretaries that they would not divulge the secret to Sheldon. Neither Flannery, Barr, Vierling nor Taylor discussed the matter with Sheldon and none of their conversations was in his presence. The call to Davis concerning the cards was made from Taylor's home and Barr and Vierling signed their cards at Barr's home. Although Flannery signed his card in the control room at the station, it was not in Sheldon's presence. At the time of the discharge of Flannery and Barr, Davis had not notified Sheldon that any of the men had signed authorization cards, and when Sheldon was notified the following day it appears that he was taken by complete surprise. This is reflected in his conversation with Taylor immediately after the call when he asked Taylor if he knew the men were going union and when Taylor replied that he did, Sheldon asked him why he didn't tell him. Flannery and Barr had already been notified of their termination at that time. The remark by Davis to Sheldon in July that the union was going to organize the announcer-operators cannot be regarded as evidence that it was being done or that any or all of the announcers were participating in organizational activities.

We have held that it is impossible for a discharge to be discriminatory if the employer has no knowledge of the employee's union activity. In N.L.R.B. v. Ace Comb Co., 342 F.2d 841, 848 (8th Cir. 1965), Judge Ridge, speaking for the court, said:

"This Court has held that coincidence in time between Union activity and discharge does not in itself raise an inference of knowledge on the employer's part of the Union members without some direct evidence of knowledge. N.L.R.B. v. Falls City Creamery Co., 207 F.2d 820 (8 Cir. 1953).

"The Examiner made much of the fact that one of the employees who knew of Woodliff's Union activities later

turned out to be pro-management in the labor dispute. Such a circumstance, absent some evidence that the employee communicated his knowledge about his fellow employee to the Company, is insufficient to raise an inference of knowledge on the part of the Company. Cf. N.L.R.B. v. Ray Smith Transport Co., 193 F.2d 142 (5 Cir. 1951).

"While there is authority to the effect that in a small plant in a small town, knowledge on the employer's part of the organizational activities of the employee can be inferred, as pointed out in the Falls City case, supra, this inference cannot stand without some direct evidence to support it, and this idea is not restricted to the Falls City case alone. Indiana Metal Products Corp. v. N.L.R.B., 202 F.2d 613 (7 Cir. 1953). It is, of course, impossible for a discharge to be discriminatory without knowledge on the part of the employer of the employee's Union activities."

See also Dubin-Haskell Lining Corp. v. N.L.R.B., 375 F.2d 568, 573 (4th Cir. 1967).

 It is true that in the *Ace Comb* case there was a definite denial on the part of management as to knowledge of the employee's union membership, as well as abundant evidence that there was justifiable cause for the employee's discharge, but an employer may discharge an employee for any reason of his own so long as it is not based on his opposition to union activities. It has been many times said that an employer has the right to discharge an employee for good reason, bad reason or no reason at all, absent discrimination. N.L.R.B. v. Arkansas Grain Corp., 392 F.2d 161, 167 (8th Cir. 1968); Fort Smith Broadcasting Co. v. N.L.R.B., 341 F.2d 874, 879 (8th Cir. 1965); Steel Industries, Inc. v. N.L.R.B., 325 F.2d 173, 177 (7th Cir. 1963); Portable Electric Tools, Inc. v. N.L.R.B., 309 F.2d 423, 426 (7th Cir. 1962). An employer has a right to hire and fire at will so long as such action is not based on opposition to legitimate union activity. Singer Co. Wood Products Div. v. N.L.R.B., 371 F.2d 623, 624 (8th Cir. 1967); N.L.R.B. v. Monroe Auto Equip. Co., 368 F.2d 975, 980–981 (8th Cir. 1966); Banner Biscuit Co. v. N.L.R.B., 356 F.2d 765, 770 (8th Cir. 1966). To the same effect, see N.L.R.B. v. Bangor Plastics, 392 F.2d 772, 776–777 (6th Cir. 1967), and cases there cited.

In Beaver Valley Canning Co. v. N.L.R.B., 332 F.2d 429, 432 (8th Cir. 1964), we quoted from N.L.R.B. v. South Rambler Co., 324 F.2d 447, 449–450 (8th Cir. 1963), as follows:

" 'Certainly, an employer may hire and discharge at will, so long as his action is not based on opposition to union activities. * * * Furthermore, an employer's general hostility to unions, without more, does not supply an unlawful motive as to a specific discharge. * * * An inference that a discharge of an employee was motivated by his union activity must be based upon evidence, direct or circumstantial, not upon mere suspicion. * * * and the burden of proving an improper motive for discharge is upon the Board. * * *' "

We further stated at page 433:

"Absent knowledge of union activity, the Company could not have been motivated in the layoff by anti-union animus. The near coincidence of the layoffs with the union activity, without more, is not substantially indicative of a discriminatory motive. N.L.R.B. v. Shen-Valley Meat Packers, Inc., 211 F.2d 289 (4th Cir. 1954); N.L.R.B. v. Whitin Machine Works, 204 F.2d 883 (1st Cir. 1953)."

 The Board argues that since Sheldon told the announcers that they were not being discharged for unsatisfactory work, coupled with the fact that only a few days before Sheldon had outlined their new hours and duties with no hint of their discharge, it can be reasonably inferred that they were discharged because of their union activity and the

signing of authorization cards. It is true that facts may be proven indirectly as well as directly, but the indirect evidence must be substantial. Dubin-Haskell Lining Corp. v. N.L.R.B., *supra* (375 F.2d at 573). In N.L.R.B. v. Melrose Processing Co., 351 F.2d 693, 698 (8th Cir. 1965), this court, speaking through Judge Gibson, said:

> "It is well known that a given fact may be proven indirectly as well as directly. If one can show that every other alternative except the fact sought to be proved is not true, you indirectly prove that fact is true. By excluding every other reasonable hypothesis that fact is left standing alone as proved. The evidence before the Board aimed at this goal. By showing that there was no other reasonable explanation for Miss Thielen not being rehired, her union activity stood out as the logical explanation of her employer's action. While this method is not infallible, it succeeds in providing circumstantial evidence to illuminate the issue."

In the *Melrose* case, however, there was evidence that the discharged employee was a known leader of the organizing movement, which was not the case with Barr and Flannery at the time of their discharge. Company knowledge of union activity on their part can be established, if at all, by inference only. Inferences drawn by the Board should be based on substantial evidence or facts reasonably established. N.L.R.B. v. Murray Ohio Mfg. Co, 326 F.2d 509, 513 (6th Cir. 1964). In Acme Products, Inc. v. N.L.R.B., 389 F.2d 104, 106 (8th Cir. 1968), Judge Van Oosterhout said:

> "The Board is entitled to draw reasonable inferences from the evidence but some substantial evidentiary basis must exist to support the inference drawn. Inferences cannot be based purely on speculation."

The Board's power to draw inferences is not beyond all judicial control, and upon the courts is cast the responsibility of determining whether a Board finding of fact, based on inference or otherwise, is supported by substantial evidence, when viewed on the record as a whole. Universal Camera Corp v. N.L.R.B., *supra;* N.L.R.B. v. Murray Ohio Mfg. Co., *supra.*

Barr testified that Sheldon gave as the reason for discharging him that there was too much dissension in the ranks. He told Vierling that he was making a change in the entire staff because of disunity between the management and the staff. The Company showed by the cross-examination of the Board's witnesses that they were surprised at Sheldon's appointment as general manager because of his shorter tenure with the Company, although they denied that they were resentful. They admitted that there were problems but attributed most of them to the move to the new location where the close proximity of the transmitter prohibited the playing of tapes, which was done by merely pushing a button and throwing a switch, and required the playing of records, which resulted in more work. Also some of the complaints concerning working hours and the selection of music which were voiced by the announcers were made during the time Ceries was general manager and not Sheldon. The Company contends, however, that Sheldon had a right to "clean house" if he felt he could not elicit the cooperation and support of the employees, and in the absence of proof of the Company's knowledge of union activities by Flannery and Barr prior to their discharge, this cannot be considered a motive, thereby making the discharge discriminatory.

Vierling's discharge is somewhat different in that Sheldon had been notified by Davis prior to Vierling's discharge that he thought he had a majority of the announcers signed up for union representation although it is not shown whether Davis named those who had signed authorization cards. At least, Sheldon knew at that time that some of the announcers had been engaging in union activity. The Company, however, argues that Vierling's discharge was part of an

overall plan which had been instituted several days earlier. While the Company's case is not as clear-cut where Vierling is concerned, nevertheless, there is a lack of direct proof that Sheldon was aware when he discharged Vierling that he was personally engaged in union activity or had signed an authorization card. When this is taken into consideration, along with the fact that the cleaning house operation had begun prior to the time Sheldon learned of the union activity, we do not believe that the burden of proof of discriminatory conduct on the part of the Company has been met.

■ The Trial Examiner held that Taylor's demotion to background music work amounted to a constructive discharge. The Company contends that he quit. After the controversy arose as to Taylor's wages as chief engineer and Sheldon refused to allow him the $190.00 per week designated in the contract, he reverted to the performance of the duties of broadcast engineer at a salary of $175.00 per week, and was to receive overtime for additional work. It was after the controversy arose concerning the overtime pay that Sheldon and Grafman decided that Taylor was best suited for background music work, for which the pay was $144.00 a week. Taylor, as a matter of fact, asked for a letter of dismissal and Grafman told him he could consider himself dismissed immediately as broadcast engineer. Taylor then requested three days to consider reemployment in the background music department but never accepted the job. We think there is sufficient evidence to justify the Board's finding that there was a constructive discharge.

In N.L.R.B. v. United States Air Con. Corp., 336 F.2d 275, 276 (6th Cir. 1964), the court held that the Board's finding of constructive discharge was supported by substantial evidence where, although the five discharged employees were reemployed, it was not to their former or substantially equivalent positions. See also and compare N.L.R.B. v. Tennessee Packers, Inc., Frosty Morn Div., 339 F.2d 203 (6th Cir. 1964).

While there is some evidence that Taylor's work was not entirely satisfactory at all times and that Sheldon had talked with him about the work not being done the way he wanted and in the time he wanted it done, we agree with the Trial Examiner that this was overcome by his advancement first to broadcast engineer and then to chief engineer.

The Trial Examiner held that if Taylor were at that time the only engineer at the station (which it appears that he was), he acted in concert in his reliance on the collective bargaining contract, and the Company's acceptance thereof created a situation in which discharge because of such reliance discouraged union activities with respect to the contract and among employees generally Cf. N.L.R.B. v. Interboro Contractors, Inc., 388 F.2d 495, 500 (2nd Cir. 1967). The Examiner found that Taylor's constructive discharge was prompted by his protected concerted activities and by his warning that he would go to the union, which clearly showed the discriminatory nature of his discharge. We think the record amply supports this finding.

■■ We do not agree, however, that the question by Sheldon to Taylor on August 10 inquiring whether he knew the men were going union, after Sheldon had been informed of it by Davis, constituted prohibited interrogation. Sheldon was not asking for additional information but merely asking whether Taylor already knew what he had just learned. When Taylor answered in the affirmative, we think it was only natural for Sheldon to inquire why he didn't tell him. Isolated interrogation, free of coercive statements and absent resort to systematic intimidation, does not constitute an unfair labor practice but falls within the free speech protection of the Act. Beaver Valley Canning Co. v. N.L.R.B., supra (332 F.2d at 433). In N.L.R.B. v. Trumbull Asphalt Co. of Del., 327 F.2d 841, 844 (8th Cir. 1964), where-

in we held that on the issue of improper interrogation the record, considered as a whole, was not adequate, Judge Blackmun, speaking for this court, said:

"The most it contains is evidence that the superintendent on August 30, just after he had learned from the union that it claimed a majority, questioned Johnson as to who 'was for the Union' and that a few days later he again asked Johnson who the head of the union was. Neither the superintendent nor Johnson mentioned names and the superintendent did not speak against the union. * * * This we think falls short of what is condemned by § 8(a) (1). The situation is governed by our decision in N.L.R.B. v. Twin Table & Furniture Co., 308 F.2d 686 (8 Cir. 1962), the record in which disclosed more specific questioning than that here."

In the *Twin City* case it was held that the interrogation of employees about the union by representatives of the respondent's management was not a violation of the Act because the interrogation was innocuous and devoid of threats or promises.

■ On the other hand, we think that the Trial Examiner was correct in finding that the statement made by Sheldon to Taylor on August 20 that the announcers really shouldn't go to a union and that "there are two things in this world you never do, one of them is to go to a union to ask for representation and the other one is file suit against someone" constituted a threat. Although Taylor was already represented by a union, it threatened him with the consequences if he ever brought suit against the Company. See Colson Corp. v. N.L.R.B., 347 F.2d 128, 142 (8th Cir. 1965), cert. denied, 382 U.S. 904, 86 S.Ct. 240, 15 L.Ed.2d 157 (1965).

The petition for enforcement is denied with respect to the interrogation issue and the reinstatement of announcers Flannery, Barr and Vierling with back pay. In all other respects it is granted.

LAY, Circuit Judge (dissenting):

I respectfully dissent. I cannot in good conscience agree that the record is lacking in substantial evidence, requiring reversal of the Board as to the discharge of the three announcers.

First, I cannot agree with the majority that the trial examiner created an inference from the failure of the company to produce evidence.[1] The trial examiner recited that the inference of the company's knowledge is "more readily drawn in the absence of disclaimer (except by counsel) of knowledge by the company and of any denial by Mundy that he had transmitted the information." The majority feels that this statement placed undue emphasis on the company's failure to produce witnesses to deny knowledge of the employee's union activities. I respectfully submit this misconstrues the examiner's statement. The

1. Nor can I agree that the trial examiner in any way based his finding of company knowledge upon his misunderstanding as to the date Sheldon was told of the union's majority status. As the majority opinion recites in footnote 1, the trial examiner states "that on or about August 9 Davis told Sheldon that he had a majority and would like to discuss a contract. * * *" It is then implied that the trial examiner found company knowledge of union activity prior to the discharges on the basis of the August 9 date. The majority points out that the trial examiner erred since this date was actually August 10.

Earlier in the opinion the trial examiner recited that Davis had said that the date of notification was either August 9 or 10. The record shows that Davis said he was not sure which date it was. In any event, the date was not critical to the examiner's decision since all testimony shows that Sheldon, upon being told by Davis that the authorization cards had been signed, stated that two of the discharges were already effected. Furthermore, the examiner's reference to the August 9 date in his written findings is made in a totally different context, to-wit, the propriety of requiring a bargaining order. It is unrelated to any discussion of company knowledge of union activity.

examiner does not create an incriminating inference from the absence of proof. The examiner first recites Mundy's conversations with the other announcers. Mundy had said that he felt it would be bad for the company if he joined the union; that Mr. Grafman, his personal friend, would not like it; that it would be bad for his own job; that it was not the right thing to do; and that he *would talk to Mr. Grafman,* the president of the company, *before he would sign the card.* Later he asked the other announcers if they were actually going to sign union authorization cards. The trial examiner is saying that it is reasonable to infer from this evidence that Mundy did talk with Grafman about joining the union prior to the discharges. The examiner then adds that this inference is more easily drawn since Grafman or Mundy did not deny talking together. I fail to see that the trial examiner intended any other meaning. Absence of rebuttal evidence is a factor to be weighed by a trier of fact. It is also to be considered by this court in weighing the overall record as to whether substantial evidence exists to support the board's findings. We are required to view "the body of evidence opposed to the Board's view." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). Here there is none. I would agree, however, if the only evidence of the company's knowledge was the inference from Mundy's conversation, this by itself would be too tenuous to support the board's findings. However, in my judgment, the company's knowledge of union activities prior to the discharges is supported by a wealth of circumstantial and direct proof.

There is a profuseness of evidence which shows: (1) Sheldon, the company manager, was specifically told on July 20, 1967, by the union's business manager that the union was going to organize the announcer-operators; this statement was made at a time union representation was in fact being favorably discussed by all of the announcers, with the exception of Mundy; (2) two of the secretaries for Sheldon had approached the announcers with questions concerning the announcers' interest in joining the union; this was before the announcers had mentioned this interest to the girls; Flannery observing that Diane Bauman "apparently had gotten wind they were talking"; (3) Mundy was a personal friend of the president of the company and told the others he intended to talk to Grafman about joining the union; (4) Mundy was the only announcer not to sign a union card, and was the only announcer not to be discharged; (5) when Sheldon was told a majority of the announcers had signed authorization cards and the union would like to discuss a contract, Sheldon said he had already discharged "two of these men"; Sheldon was not told prior to this statement which men had actually signed the authorization cards and thus there is a fair inference, *unrebutted,* that Sheldon knew which ones would sign the cards before he had actual knowledge that the cards were signed; (6) Vierling's discharge, of course, followed Sheldon's actual knowledge of his being told of the signing of the cards; (7) Sheldon told the announcers that their discharge had nothing to do with work performance; (8) on August 7, all of the announcers had been assigned to a new schedule to start the following Monday and the only event intervening the posting of this new schedule and their discharge was their signing union authorization cards; (9) on July 24, Barr was even promoted by Sheldon to program director, a post he later declined; (10) Sheldon's reason for the discharges was that it was for "disunity" or "dissension in the ranks"; the only "disunity" shown *by the evidence* was the announcers' continued interest in union representation and the company's animus towards it; (11) union animus is reflected in part by the wrongful "discharge" of Taylor for his union activities; (12) and there exists, perhaps most damaging to the company, Sheldon's statement in discussing the discharges with Taylor, that "[t]hey really shouldn't go to a union" and "there are two things in this world you never do, one of them

is to go to a union to ask for representation and the other one is file suit against someone"; Taylor responded, that "these men had asked for representation before you fired them"; Sheldon answered, "that makes no difference."

There is no other reasonable hypothesis on this record to explain the announcers discharge other than their union activity. I fail to see on this record how the trial examiner or the board could reach any other conclusion.

We have found "substantial evidence" in many recent cases, enforcing the board's finding of an 8(a) (1) or 8(a) (3) violation, where the evidence is far less compelling than here. Compare the facts in NLRB v. Kay Electronics, Inc., 410 F.2d 499 (8 Cir. 1969); First National Bank of Omaha v. NLRB, 413 F.2d 921 (8 Cir. 1969); NLRB v. Crystal Tire Co., 410 F.2d 916 (8 Cir. 1969); Mead & Mount Constr. Co. v. NLRB, 411 F.2d 1154 (8 Cir. 1969); Ames Ready-Mix Concrete, Inc. v. NLRB, 411 F.2d 1159 (8 Cir. 1969); NLRB v. Frazier, Inc., 411 F.2d 1161 (8 Cir. 1969); Reliance Ins. Co. v. NLRB, 415 F.2d 1 (8 Cir. Sept. 4, 1969).

I would grant enforcement of all of the board's order save that of the interrogation issue.